UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RICHARD D. MEDINA,

                                        Plaintiff,

v.                                                                      7:15-CV-01283

                                                                        (GTS/TWD)
ANDREW CUOMO, Governor, State of New York,
DEAN G. SKELOS, Former Senate Majority Leader
Deputy Majority Leader and Current Member of the
NYS Senate,

                                        Defendants.
_____

APPEARANCES:

RICHARD D. MEDINA
Plaintiff, Pro Se
1729 Burns Avenue Apt. C
Watertown, NY 13601

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT-RECOMMENDATION</u>

        The Clerk has sent Plaintiff Richard D. Medina's pro se civil rights complaint, brought

under 42 U.S.C. § 1983, together with an application to proceed in *forma pauperis* ("IFP

Application"), to the Court for review.  (Dkt. Nos. 1 and 2.)  Plaintiff's lawsuit, commenced

against the Governor of New York State, Andrew Cuomo ("Governor Cuomo") and New York

State Senator Dean G. Skelos ("Senator Skelos"), challenges, among other things, the

constitutionality of the New York Sex Offender Registration Act of 1995, commonly referred to

as "Megan's Law" and codified at New York Correction Law ("Corr. Law") §§ 168 to 168-w

("SORA").  (*See generally* Dkt. No. 1.)

In his rambling 256 page complaint, Plaintiff has asserted thirty-four numbered causes of action, which include federal constitutional and statutory claims, a New York state constitutional claim, and a number state law tort claims. Plaintiff seeks compensatory and punitive damages, injunctive and declaratory relief, and an award of attorney's fees.[1] (Dkt. No. 1 at ¶¶ 373-86.)

## I. IFP APPLICATION

A court may grant *in forma pauperis* status if a party "is unable to pay " the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1) (2006). After reviewing Plaintiff's IFP Application (Dkt. No. 2), the Court finds that he meets the standard and his IPF Application is granted.[2]

## II. LEGAL STANDARDS FOR INITIAL REVIEW

Even when a plaintiff meets the financial criteria for *in forma pauperis*, 28 U.S.C. § 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the

---

[1] Plaintiff is seeking relief against not only the named Defendants but their "agents, persons working with them or on their behalf, their servants, who in their individual capacity and official capacity, and who knew or should have known , while acting under color of state law," of the deprivation of Plaintiff's rights and the irreparable harm suffered by him as a result of the "enactment, implementation, administration, and enforcement" of SORA. (Dkt. No. 1 at 1-2.) The Court's initial review of the complaint under 28 U.S.C. § 1915(e)(2)(B)(i)-(iii) is limited to the named Defendants.

[2] Plaintiff should note that although the application to proceed *in forma pauperis* has been granted, Plaintiff will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal quotation marks omitted). Although extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See, e.g., Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Id*. In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in

3

a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted). A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## III. PLAINTIFF'S COMPLAINT

### A. Factual Allegations[3]

On or about September 10, 2004, Plaintiff, who describes himself as homeless, was convicted of Sexual Abuse First Degree (N.Y. Penal Law § 130.65), a D felony; Sexual Abuse Second Degree (N.Y. Penal Law § 130.60), a class A misdemeanor; and Third Degree Sexual Abuse (N.Y. Penal Law § 130.55), a class B misdemeanor. (Dkt. No. 1 at ¶ 10.) Plaintiff was sentenced to two and a half years in state prison and three years post release supervision. *Id*. Plaintiff is not challenging his conviction, which appears to have been as the result of a guilty plea, in this lawsuit. *Id*. at ¶¶ 11- 12.

Plaintiff alleges that he was not advised at the time of his plea allocution that he was

_____

[3]   The Court has considered both the complaint and the papers submitted by Plaintiff in support of his pending motion for a preliminary injunction (Dkt. No. 3) in its initial review.

being subjected to or sentenced under a "violent offense" statute and was not advised by his attorney or the sentencing court of the imposition or consequences of SORA prior to his sentencing. *Id*. at ¶¶ 12-13. Plaintiff remembers asking his attorney at the sentencing to question the Hon. Kim H. Martusewicz, Jefferson County Court Judge, about his status under SORA and recalls his attorney requesting a level 2 status. *Id*. at ¶¶ 14-15. Judge Martusewicz responded that Plaintiff's status under SORA would be determined at a later time. *Id.* at ¶ 16.

Prior to his release from prison sometime in 2005 or 2006, Plaintiff was transported to Jefferson County Court for a hearing which may have concerned his initial classification under SORA, although he cannot recall any specifics regarding the hearing, except that he did not stand before the court and state that he was "sexually violent, dangerous, or prone to recidivism" during the proceedings. *Id*. at ¶¶ 20-21. Plaintiff has no recollection of having been represented by counsel, and has alleged that while he requested an "appeal" to his legal arguments and defenses, none was provided by the court. *Id*. at ¶¶ 24-25.

In or about April 2006 when he was released from prison and placed on post-release supervision, an unknown Department of Corrections and Community Supervision employee gave Plaintiff a form to sign indicating that he was a sex offender and required to comply with SORA. *Id*. at ¶¶ 31-32. Plaintiff was subsequently arrested for the post-supervision release violation of living at other than an approved address and violating his sex offender counseling requirements by failing to write and provide a daily journal to the counselor. *Id*. at ¶ 33. Plaintiff was found guilty of the sex offender treatment violation and returned to state prison for twenty-three months. *Id*. at ¶ 34.

Plaintiff was released to post-release supervision again in or about November 2008 and

believes that sometime between December 2008 and July 2009, he was required to report to Jefferson County Court to be classified as a level 1, 2, or 3 sex offender. *Id*. at ¶ 37. Plaintiff was provided with counsel and following one or more hearings was classified as a level 3 sex offender by Judge Martusewicz. *Id*. at ¶ 40. According to Plaintiff, he again did not stand before the court and state he was "sexually violent, dangerous, or prone to recidivism." *Id.* at ¶ 41.

As a level 3 sex offender, Plaintiff is subject to a number of reporting requirements, including that he report to the local police at statutorily prescribed intervals and provide them with information that, among other things, includes his address. *Id*. at ¶ 44. According to Plaintiff, he had a residence in Jefferson County for two to four months in 2009 but then became homeless because he had no income of any kind for a period, was ineligible for state aid, was unable to reside in public housing, and was not allowed to stay with family members and associates who would not permit their addresses to appear on the SORA website for fear of discrimination, harm, and financial burdens. *Id.* at ¶ 47. Plaintiff claims to have been homeless since that time. *Id*. Plaintiff stays "temporarily wherever he can." *Id*. at ¶51.

Plaintiff reported to either the City of Watertown Police Department or Jefferson County Sheriff's Department in satisfaction of the level 3 reporting requirements for five years, and from approximately July 2009 until he reported in August of 2015, had been permitted to put "homeless" as his address. *Id*. at ¶ 48. According to Plaintiff's submission on his pending motion for a preliminary injunction, when he went to the Jefferson County Sheriff's Department to satisfy his ninety day registration and verification under SORA, Corr. Law § 168-f, on or about August 7, 2015, he was subjected to an hour long interview by the interrogating officer who indicated that he wanted to get to know the sex offenders he was required to question. (Dkt. No.

6

3 at ¶¶ 5-6.)  The officer demanded that Plaintiff provide his address, and Plaintiff responded that he was homeless pursuant to New York State law and had been permitted to report as homeless by an officer no longer with the department since July of 2009.  *Id*. at ¶ 9.

The interviewing officer made reference to family members of Plaintiff who lived in public housing as a possible address for Plaintiff, and Plaintiff informed him that he did not reside with his family members in a residence status, and advised him against including their address on the duty to register and verify form.  *Id*. at ¶ 13.  The officer, without Plaintiff's knowledge, nonetheless included what he believed to be the family members' address as Plaintiff's address on the registration and verification form he gave Plaintiff to sign.  *Id*. at ¶¶ 19-22.  Plaintiff would not have signed the form had he been aware of the address used by the officer because he knew that a false address could result in his being subjected to state and federal penalties.  *Id*. at ¶ 24.

There are no allegations in Plaintiff's complaint plausibly showing any involvement by Governor Cuomo or Senator Skelos, in their official or individual capacities, in the August 2015 ninety day registration and verification at the Jefferson County Sheriff's Department.

### B.    Plaintiff's Claims

In his civil rights claim under 42 U.S.C. § 1983, Plaintiff alleges that Defendants have violated his rights under the First, Fourth, Fifth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the United States Constitution.  (*See generally* Dkt. No. 1.)   In addition to his civil rights claims under 42 U.S.C. § 1983, Plaintiff has asserted civil rights claims under 42 U.S.C. §§ 1981, 1985, and 1986, along with a claim for attorney's fees under 42 U.S.C. § 1988. *Id*. at ¶¶ 315-325.  Plaintiff also claims that Defendants have violated the Fair Housing Act

("FHA"), 42 U.S.C. §§ 3601-3619, by criminally interfering with his right to fair housing, and 18 U.S.C. §§ 1581, 1584, 1589, 1590, 1594, and 1595 by selling him into involuntary servitude, forced labor, and obstructing enforcement by returning him to a condition of peonage.[4]  *Id*. at ¶¶ 326-27, 348-59, 362-63.

Plaintiff has also asserted a number of state law tort claims, most of which he has erroneously identified as being brought under 42 U.S.C. § 1983.  Those claims include, false arrest, false or unlawful confinement and detention, misconduct of office, negligence and intentional negligence, intentional infliction of emotional distress, and larceny and fraud.  *Id*. at ¶¶ at 328-342.  In addition, Plaintiff claims that Defendants have violated his rights under NY Const. art. 1, § 8, which guarantees freedom of speech.  *Id*. at ¶¶ 368-70.

### C.    Relief Sought

Plaintiff seeks the following relief: (1) punitive damages of $60,000,000 jointly and severally against Defendants, or a minimum of $20,000 per day since Sept. 2004, or the date of the imposition of SORA on Plaintiff; (2) compensatory damages of $10,000,000 jointly and severally against Defendants; (3) costs of the suit commensurate with its importance to the nation; (4) a declaration that the acts and omissions described in the complaint have violated Plaintiff's rights under the United States Constitution; (5) a declaration that the acts and

---

[4]  18 U.S.C. §§ 1581, 1584, 1589, 1590, 1594, and 1595 are criminal statutes, not statutes under which the Defendants could be found civilly liable to Plaintiff.  Therefore, the Court finds those claims to be frivolous and recommends dismissal with prejudice on initial review under 28 U.S.C. § 1915(e)(2)(B)(i).  The Court likewise finds Plaintiff's claim for criminal interference with the right to fair housing frivolous upon initial review inasmuch as it is the FHA, and not state law, that prohibits owners of federally assisted housing from admitting to such housing "any household that includes any individual who is subject to a lifetime registration requirement under a State sex offender registration program.  *See* 42 U.S.C. § 13663(a).

omissions described in complaint have violated Plaintiff's rights under the New York State

Constitution; (6) such injunctive relief as is proper; (7) the court direct that all records related to

Plaintiff's participation in and classification under SORA be expunged; (8) the court direct that

all records and information not lawfully permitted to be released before SORA be expunged and

Defendants be directed to enact a law requiring any such person to cease and desist; (9)

Defendants be directed to contact all agencies, institutions, organizations and people that have

used Plaintiff's images or photographs through SORA and require that they be deleted; (10)

Defendants be directed to admit publicly that they have acted inconsistent with the Constitution;

and (11) an award of legal fees. *Id*. at ¶¶ 373-386.

## IV.   ANALYSIS

### A.    SORA

#### 1.    <u>Classification Procedure</u>

SORA, Corr. Law §§ 168 *et seq*., became effective on January 21, 1996. *Doe v. Pataki*,

120 F.3d 1263, 1266 (2d Cir. 1997). SORA requires sex offenders, defined to include

individuals convicted of certain enumerated crimes, to register with the New York State Division

of Criminal Justice for a specified period of time. *Id*. The time period of required registration

and level of community notification depends in part upon the risk level assigned to the offender.

The risk levels are level 1    offenders with a low risk of re-offense; level 2    risk of repeat is

moderate; and level 3    risk of repeat offense is high and there exists a threat to the public safety.

Corr. Law § l68-l(6).

The sex offender must be notified that his case is under review no less than thirty days

before the New York State Board of Examiners of Sex Offenders' ("Board") recommendation

and is permitted to submit to the Board any information deemed relevant. Corr. Law § 168-n(3). The factors considered by the Board in determining risk level include such things as whether the offender has a mental abnormality or personality disorder, whether the offender's conduct was characterized by repetitive and compulsive behavior, associated with drugs or alcohol, the age of the offender and of the victim, the use of weapons, violence, the infliction of serious bodily injury, the number of prior offenses, response to treatment, and the victim impact statement. Corr. Law § 168-l(5).

While the Board makes a recommendation as to classification level, it is the sentencing court that determines the level of classification after a hearing held prior to the sex offender's release from incarceration. Corr. Law § 168-n(1). At least twenty days before the determination proceeding, the court is required to notify the sex offender and his counsel and the district attorney in writing of the date of the proceeding and also to provide them with a copy of the Board's recommendation and any statement of reasons for the recommendation. Corr. Law § 168-n(3). The sex offender is given notice of the right to a hearing prior to the court's determination, and the right to counsel, and to the appointment of counsel if he is financially unable to retain counsel. *Id.* The sex offender is allowed to appear and be heard in court, and the court is required to grant an adjournment for the offender or district attorney to obtain necessary materials. *Id.* The district attorney bears the burden of proving the facts supporting the determination by clear and convincing evidence. *Id.*

The court is required to render an order setting forth its determination and the findings of fact and conclusions of law on which the determination is based. *Id.* The sex offender is entitled to appeal from the determination. *Id.*

## 2. Level 3 Offender Requirements

A sex offender is given a level 3 classification when "risk of repeat offense is high and there exists a threat to the safety of the public." Corr. Law § 168-l(6)(c). An offender whose risk of re-offense is high is "deemed a sexually violent person." *Id*. As a level 3 sex offender, Plaintiff has a life-time registration requirement. Corr. Law § 168-h(2). A level 3 sex offender may be removed from the registry only if his conviction is overturned or he is pardoned. Corr. Law § 168-f(5).

Level 3 sex offenders are required to register and "shall personally appear at the law enforcement agency having jurisdiction within twenty days of the first anniversary of the sex offenders initial registration and every year thereafter during the period of registration for the purpose of providing a current photograph of such offender. . . ." A level 3 sex offender "shall also personally verify his address every ninety days with the local law enforcement agency having jurisdiction where the offender resides." Corr. Law. § 168-h(3).

## B. Absolute Legislative Immunity – Senator Skelos

Defendant Senator Skelos was SORA's sponsor in the New York State Senate. *See Doe v. Pataki*, 120 F.3d at 1277. There are no allegations in Plaintiff's complaint plausibly showing that Skelos had any official or personal involvement in matters related to Plaintiff's claims outside of the scope of his legislative actions in the enactment of SORA.

NY Const. art. III, § 11, echoing the Speech or Debate Clause of US Const. art. I, § 6, provides that "[f]or any speech or debate in either house of the legislature, the members shall not be questioned in any other place." The New York Court of Appeals has held that this clause

confers immunity for any acts which are an integral part of the legislative process.  *People v. Ohrenstein*, 563 N.Y.S.2d 744, 752 (1990).

State legislators also have absolute federal common law immunity from civil liability for their legislative activities.  *See Bogan v. Scott-Harris*, 523 U.S. 44, 46 (1998) ("It is well established that federal, state, and regional legislators are entitled to absolute immunity from civil liability for their legislative activities."); *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210 (2d Cir. 2003) ("Legislators are entitled to absolute immunity from civil liability for their legislative activities.").  The immunity extends to claims for damages, declaratory, and injunctive relief.  *See Tenney v. Brandhove*, 341 U.S. 367, 379 (1951).

Based upon the foregoing, the Court finds that Defendant Skelos has absolute legislative immunity from Plaintiff's claims and recommends that all of the federal claims asserted again him in this action be dismissed with prejudice under 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim.[5]

### C.    Official Capacity Claims for Money Damages Against Governor Cuomo

The Court has construed Plaintiff's civil rights claims against Defendant Cuomo under 42 U.S.C. § 1981, 1983, 1985, and 1986, and the claim under the FHA as having been brought against the Governor in both his official and individual capacities.  With regard to Plaintiff's official capacity claims against Governor Cuomo, the Eleventh Amendment protects states against suits brought in federal court absent their consent or express waiver of sovereign

---

[5]    Inasmuch as Plaintiff has alleged no personal involvement by Senator Skelos in the violation of his constitutional rights, the Court's analysis herein of Governor Cuomo's individual liability applies equally to Senator Skelos.

immunity.[6] *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 92-100 (1984). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006)), and bars all money damages claims against state officials acting in their official capacities, including Governor Cuomo.[7] *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985); *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003) ("The Eleventh Amendment bars the award of money damages against state officials in their official capacities.")

The Court finds that Plaintiff's official capacity claims for money damages under 42 U.S.C. §§ 1981, 1983, 1985, and 1986, and the FHA are barred by the Eleventh Amendment and recommends dismissal of those claims with prejudice for lack of subject matter jurisdiction.[8]

---

[6] Courts have clearly rejected the premise that 42 U.S.C. §§ 1981, 1983, 1985, and 1986 act to abrogate state sovereign immunity. *See Quern v. Jordan*, 440 U.S. 332, 345 (1979) (Congress did not abrogate state sovereign immunity in enacting 42 U.S.C. § 1983); *Fincher v. State of Florida Dep't of Labor, & Employment Sec.*, 798 F.2d 1371, 1371 (11th Cir. 1986) (same as to § 1985); *Coger v. Connecticut*, 309 F. Supp. 2d 274, 281 (D. Conn. 2004) same as to § 1981); *Seibert v. Oklahoma*, 867 F.2d 591, 594 (10th Cir. 1989) (same as to § 1986), *abrogated on other grounds by Federal Lands Legal Consort, ex rel. Robart Estate v. United States* 195 F.3d 1190 (10th Cir. 1999). Courts have also rejected the contention that the FHA abrogates sovereign immunity. *See Super v. D'Amelia & Assoc.*, No. 3:09cv831 (SRU), 2010 WL 3926887, at *6, 2010 U.S. Dist. LEXIS 103544, at * 41 (D. Conn. Sept. 30, 2010) (no congressional abrogation of sovereign immunity in the FHA); *Gregory v. S.C. DOT*, 289 F. Supp. 2d 721, 924-25 (D.S.C. 2003) (same).

[7] The Eleventh Amendment would also bar official capacity claims against Senator Skelos were the Court not recommending dismissal of the complaint against him on absolute judicial immunity grounds.

[8] A finding that a defendants is entitled to sovereign immunity means the court lacks subject matter jurisdiction. *See McGinty v. New York*, 251 F.3d 84, 101 (2d Cir. 2001).

**D.    Official Capacity Claims Against Governor Cuomo for Injunctive and Declaratory Relief**

Plaintiff seeks a declaratory judgment that Governor Cuomo has violated his rights under the United States and New York State Constitutions.  (Dkt. No. 1 at ¶¶ 378-79.)  Plaintiff asks for such injunctive relief as is proper.  *Id.* at ¶ 381.  More specifically, Plaintiff seeks relief in the form of a mandatory injunction directing Governor Cuomo to expunge all of the records relating to Plaintiff's participation in SORA; directing that all records and information that could not have been lawfully released prior to SORA be expunged and that Defendants be directed to enact a law directing that those releasing the records cease and desist; directing Governor Cuomo to contact all agencies that have used Plaintiff's images through SORA and ordering that they be deleted; and directing the Governor to admit publically that his actions have been inconsistent with the Constitution.  *Id.* at ¶¶ 382-385.

Under *Ex parte Young*, 209 U.S. 123 (1908), a person may sue a state for prospective injunctive and declaratory relief.  *See Mary Jo C. v. New York State and Local Retirement System*, 707 F.3d 144, 166 (2d Cir. 2013) ("Under the well-known exception to the Eleventh Amendment's grant of sovereign immunity from suit first set forth in *Ex parte Young*, a plaintiff may sue a state official acting in his official capacity    notwithstanding the Eleventh Amendment   for prospective, injunctive relief from violations of federal law.") (citations and internal quotation marks and punctuation omitted).  As with injunctive relief, declaratory relief dealing solely with past violations, where there is no present violation, is also barred under the Eleventh Amendment.  *See Green v. Mansour*, 474 U.S. 64, 73 (1985).  Plaintiff's claims for injunctive

and declaratory relief can be liberally construed as seeking both retrospective and prospective relief, and to the extent they seek prospective relief they would not be barred under the Eleventh Amendment.

**E.      Section 1983 Claims Against Governor Cuomo in his Individual Capacity**

Plaintiff's allegations that his rights under the First, Fourth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the Constitution have been violated fall under his 42 U.S.C. § 1983 claim. It is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995); *see also Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973) ("The rule in this circuit is that when monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendants is required."). The Plaintiff's complaint is devoid of specific allegations of personal involvement by Governor Cuomo in the alleged violation of his constitutional rights, and the Court therefore recommends dismissal of the complaint against the Governor in his individual capacity.

**F.      Plaintiff's Individual Claims Against Governor Cuomo Under 42 U.S.C. §§ 1981, 1985, and 1986**

Plaintiff has asserted claims against Cuomo under 42 U.S.C. §§ 1981, 1985, and 1986 in addition to his § 1983 claim.

Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts, to sue, be parties, give

15

evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981(a).  To establish a claim under § 1981, a plaintiff must show that (1) he is a member of a protected class; (2) defendant intended to discriminate against plaintiff based upon his membership in the protected class; and (3) the discrimination concerned one or more of the activities enumerated in § 1981.  *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000).  Plaintiff has failed to allege facts in his complaint plausibly showing that his rights have been violated under § 1981.

Furthermore, in order to make out a claim for individual liability under § 1981, "a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action. . . . [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement."  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000).  Plaintiff's complaint is devoid of allegations showing personal involvement by Cuomo in the alleged § 1981 violation.

The elements of a claim under 42 U.S.C. § 1985(3) are "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, . . . (3) an act in furtherance of a conspiracy; (4) whereby a person is . . . deprived of any right of a citizen of the United States."  *Brown*, 221 F.3d at 341 (citation and internal quotation marks omitted).  The "conspiracy must also be motivated by some racial or perhaps otherwise class based animus behind the conspirators' action."  *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (per curiam) (citation and internal quotation marks omitted).  The law is clear that conclusory, vague, or general allegations of conspiracy are not enough to sustain a claim under § 1985.  *See Leon v. Murphy*, 988 F.2d 303,

311 (2d Cir. 1993).

Plaintiff's complaint is devoid of allegations plausibly showing the existence of a conspiracy under § 1985.  Moreover, Plaintiff's failure to show personal involvement by Governor Cuomo in any conspiracy under § 1985 is fatal to his claim.  *See Keitt v. Hawk*, No. 9:13-cv-850 (GLS/ATB),  2015 WL 1246058, at * 19, 2015 U.S. Dist. LEXIS 34240, at * 55 (N.D.N.Y. Jan. 8, 2015) (lack of personal involvement is fatal to a claim under 42 U.S.C. § 1985).

42 U.S.C. § 1986 provides that persons with "knowledge of any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured . . . for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented . . . ."  Absent a violation of § 1985, there can be no violation of § 1986.  *Brown,* 221 F.3d at 341.

Based upon the foregoing, the Court recommends that Plaintiff's claims against Governor Cuomo under 42 U.S.C. §§ 1981, 1985, and 1986 be dismissed upon initial review for failure to state a claim.[9]

G.     **First Amendment**

Although far from clear, the gist of Plaintiff's claim that SORA violates his rights under the First Amendment appears to be that SORA violates the prohibition on compelled speech and constitutes a violation of his right to privacy.

---

[9]   As noted above, Senator Skelos would also be entitled to dismissal of any federal claims asserted against him in his individual capacity based upon lack of personal involvement.

1.    <u>Compelled Speech</u>

According to Plaintiff, SORA deprives him of his rights to freedom of speech, expression,

association, and religion through the duty to register and verify because it compels him to appear

and speak with law enforcement officials and provide them with certain information and pictures,

and impermissibly "compel[s]" his "content, messages, ideas, and subject matter."[10]  (Dkt. No. 1

at ¶¶ at 64-71.)

The relevant Supreme Court precedent on compelled speech is *Virginia State Board of*

*Education v. Barnette*, 319 U.S. 624 (1943) and *Wooley v. Maynard*, 430 U.S. 705 (1977).

*Barnette* involved a First Amendment challenge to a state statute that required public school

students to participate in daily ceremonies honoring the flag.  The Supreme Court framed the

---

[10]    In Paragraph 84 of his complaint, Plaintiff alleges that SORA impermissibly allows
Defendants:

> to compel him by coercion, threat of force, and actual force, to
> comply every day, every 10 days, every 90 days, and yearly, and for
> life, whether by personally reporting form or by mailed verification
> form at "particular places and times" requiring the plaintiff to say
> the following and is forced to tell them through written, oral, and
> photographic testimonial admissions that "I live at said address, I
> live with my family or associations at said address, I work at said
> address and for said employer, I am homeless, I attend said school
> at said address, I use the internet at such time and such places with
> said names and said identifiers, I have changed my appearance, my
> beard, my hair, my eye color . . . and that the plaintiff cannot say to
> them, I want to stop reporting to you as I don't even know you, as I
> have no contact with you and I don't want to have any contact with
> you, but I can't because you have the power to do so without my
> permission, and to be able to say enough is enough, but I cannot
> because you deny me my right to use my Freedom of Speech,
> Freedom of Expression, of the Press, of Association, and of
> religion . . . and that defendants will put me in jail and take away
> my life, liberty, happiness and property if I want to say to
> defendants that I will no longer tell you where I live . . . .

issue before it as whether "a ceremony so touching matters of opinion and political attitude may be imposed upon the individual by official authority under powers committed to any political organization under our Constitution," and concluded it could not. In doing so, the Court noted with regard to the First Amendment prohibition on compelling such speech that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by work or act their faith therein." *Barnette*, 319 U.S. at 642.

*Maynard* involved a New Hampshire law requiring all noncommercial vehicles to bear a license plate with the state motto "Live Free or Die." The plaintiff in *Maynard* challenged the requirement under the First Amendment on the grounds that it conflicted with his faith and coerced him into "advertising a slogan which [he found] morally, ethically, religiously and politically abhorrent." *Maynar*d, 430 U.S. at 713. The Supreme Court acknowledged the protection of the right to remain silent under the First Amendment found in *Barnette*, and suggested that a state could violate that protection: (1) by forcing an individual through speech to affirm a religious, political, or ideological cause that the individual did not believe in; or (2) by forcing an individual as a part of his daily life to be an instrument for fostering public adherence to an ideological point of view in which he did not believe. *Id*. at 715.

In *United States v. Arnold*, 740 F.3d 1032 (5th Cir. 2014), the Fifth Circuit rejected the plaintiff's claim that the registration requirements of the Sex Offender Registration and Notification Act "(SORNA"), 42 U.S.C. § 16913, requiring the sex offender to register and keep the registration current in each jurisdiction where he resided, worked, or went to school, violated his First Amendment right against compelled speech. The court explained that the plaintiff had

not urged that SORNA required him to "(a) affirm a religious, political, or ideological belief he disagree[d] with or (b) to be a moving billboard for a governmental ideological message." *Id*. at 1035.

The circuit court in *Arnold* found support for its rejection of the First Amendment claim in the decision in *United States v. Sindel*, 53 F.3d 874 (8th Cir. 1995), in which the court rejected a claim that compelled disclosure of information on an IRS form was unlawful compelled speech. The court in *Sindel* had found that "[t]here is no right to refrain from speaking when essential operations of government require it for the preservation of an orderly society as in the case of compulsion to give evidence in court." *Id*. at 878 (citation and internal quotation marks omitted). The court in *Arnold* concluded that "[t]he logic of *Sindel* extend[ed] to the present case," explaining that "when the government, to protect the public, requires sex offenders to register their residence, it conducts an essential operation of the government, just as when it requires individuals to disclose information for tax collection." (internal quotation marks and punctuation omitted). *Id*. at 1035.

The Court finds the reasoning applied in *Arnold* applicable to Plaintiff's First Amendment compelled speech claim and, as in *Arnold*, concludes that Plaintiff has failed to state a First Amendment claim for compelled speech.

2.   Right to Privacy

To the extent Plaintiff's complaint can be construed to allege a violation of privacy claim under the First Amendment, the Court notes that the Second Circuit concluded in *Doe v. Cuomo*, 755 F.3d 105, 114 (2d Cir, 2014), that the plaintiff's claim that the SORA registration and notification requirements violated any constitutional right to privacy was unsupported "[g]iven

the combination of the nature of the information released (consisting in large part of matters of public record) and the State's strong interest in releasing it." The court also recognized that there was no question that SORA's requirements "are rationally related to the aim of protecting the public." *Id. See also Cutshall v. Sundquist*, 193 F.3d 466, 481 (6th Cir. 1999) ("the Constitution does not provide [plaintiff] with a right to keep his registry information [he was required to provide under the Tennessee Sex Offender Registration and Monitoring Act] private.").

Based upon the foregoing, the Court finds that Plaintiff has failed to state a claim under the First Amendment and recommends dismissal on initial review.

###    H.    Fourth Amendment

Plaintiff has asserted a Fourth Amendment claim in his complaint. (Dkt. No. 1 at ¶¶ 95, 297-99.) In *Doe v. Cuomo*, the Second Circuit rejected the plaintiff's argument that the registration requirements under SORA violated his Fourth Amendment right to be free from unreasonable searches and seizures. The Court wrote:

> . . . Doe argues that the registration requirements violate his Fourth Amendment right to be free from unreasonable searches and seizures. Even if we assume for argument that SORA's requirements subject Doe to a search or seizure for Fourth Amendment purposes, we cannot agree that any such search or seizure is unreasonable. Here, any searches or seizures required by SORA serve special needs    such as the protection of potential future victims and the solving of crimes in the future    and purport neither to facilitate the investigation of any specific crime nor primarily to serve a general interest in crime control. Moreover, the degree of intrusion on convicted sex offenders is reasonable in relation to the interests advanced by SORA. (citation omitted). We therefore conclude that SORA, as amended and as applied to Doe, does not run afoul of the Fourth Amendment. (citations and internal quotation marks omitted).

*Doe v. Cuomo*, 755 F.3d at 115.

Although the plaintiff in *Doe v. Cuomo* was a level 1 sex offender, the Court finds the Second Circuit's rationale in rejecting the plaintiff's Fourth Amendment claim equally applicable to the Fourth Amendment claim of Plaintiff, a level 3 sex offender, and recommends dismissal of the claim on initial review.

## I.      Fifth Amendment

Plaintiff appears to allege that his Fifth Amendment rights are violated because the registration and reporting requirements under SORA compel him to be a witness against himself and to incriminate himself.  (Dkt. No. 1 at ¶ 95.)   The Fifth Amendment prohibits the government from compelling an individual "in any criminal case to be witness against himself." US Const. amend. V.  The provision extends to any proceeding in which the answers might incriminate an individual in a future criminal proceeding. *Allen v. Illinois*, 478 U.S. 364, 368 (1986).

In *United States v. Simon-Marcos*, 363 F. App'x 726 (11th Cir. 2010), one of the few decisions involving a Fifth Amendment claim similar to that asserted by Plaintiff, the court concluded that none of the information the plaintiff was required to provide under Georgia's sex offender registration statute would "have confronted him with a substantial hazard of self-incrimination" for Fifth Amendment purposes. *Id*. at 728.  The information included the plaintiff's name; social security number; age; race; sex; date of birth; height; weight; hair color; eye color; fingerprints; photograph; place of residence; place of employment; vehicle make, model, color and licence plate tag number; e-mail address, username and user passwords; the crime which required registration; and the date released from prison. *Id*.; O.C.G.A. § 42-1-12(a)(16)(A)-(L).  The information required under SORA, §§ 168-b and 168-f(4) is similar to

that under the Georgia statute and includes the sex offender's name and aliases used; date of

birth; sex; race; height; weight; eye color; driver's license number; home address or expected

place of domicile; internet accounts with internet access providers and the internet identities used

by the offender; a photograph, which must be regularly updated and fingerprints; description of

the offense for which the offender was convicted and sentence imposed; status of enrollment at

an institution of higher education; and employment.

The Court finds, as did the Eleventh Circuit in *Simon-Marcos*, that none of the

information required under SORA is of the kind that would incriminate Plaintiff in a future

criminal proceeding and recommends dismissal of Plaintiff's Fifth Amendment claim on initial

review.

**J.    Sixth Amendment**

Plaintiff has alleged that SORA violates his rights under the Sixth Amendment.  (Dkt.

No. 1 at ¶¶ 95, 303-05.)  The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a
> speedy and public trial, by an impartial jury of the State and district
> wherein the crime shall have been committed, which district shall
> have been previously ascertained by law, and to be informed of the
> nature and cause of the accusation; to be confronted with the
> witnesses against him; to have compulsory process for obtaining
> witnesses in his favor, and to have the Assistance of Counsel for
> his defence.

US Const. amend. VI.

According to Plaintiff, he was

> [d]enied the due process and designation of a criminal case of the
> 6th Amendment requiring the plaintiff to be "informed of the
> nature and cause of the accusation" whereas the defendants claim
> the crime is merely a penalty rather than a crime as they are, a trial

through an "impartial jury" and that there is no impartiality possible when the defendants have "fraudulently persuaded the jury" the NYS DOC SORA is lawful, denied "to be confronted with the witnesses against him", as the defendants require the plaintiff to be a "witness against himself and to incriminate himself", and to be the person who provides the factual part of a criminal complaint, and to have "the Assistance of Counsel for his defense", when the defendants utilize fear, ostracization, and other political pressure to restrain the plaintiff's defense attorney from challenging the law . . . .

(Dkt. No. 1 at ¶ 95.)

SORA provides for written notice to a sex offender of both the Board determination proceeding and of the right to a hearing before the sentencing court determining the level of classification. Corr. Law § 168-n(3). Therefore, the Court finds Plaintiff's claim that he was not informed of the nature and cause of the accusation against him to be frivolous.

Sex offenders facing a risk classification have been found to have a right to the effective assistance of counsel under both state and federal standards. *See People v. Bowles*, 932 N.Y.S.2d 112, 118 (2d Dep't 2011). SORA acknowledges a sex offender's right to counsel and to the appointment of counsel in the event the offender is financially unable to retain counsel. Corr. Law § 168-n(3). Plaintiff concedes that he was afforded a hearing with representation by counsel when he was classified by the County Court as a level 3 sex offender under SORA. *Id*. at 40.

Therefore, the Court recommends that Plaintiff's Sixth Amendment challenge to SORA be dismissed upon initial review.

### K.  Eighth Amendment

Plaintiff claims that SORA violates his Eighth Amendment right to be free from cruel and unusual punishment. (Dkt. No. 1 at ¶¶ 95, 262, 306-08.) Plaintiff complains of the social

24

isolation and discrimination resulting from being perceived as a threat or danger because of his

sex offender classification, difficulty in obtaining employment, inability to receive public

housing allowances, and fear of his family members' safety if he visits or resides with them. *Id*.

at ¶ 262.

The Second Circuit has concluded that SORA is regulatory in nature and not punitive.

*See Doe v. Pataki*, 120 F.3d at 1284. Therefore, SORA does not violate the Eighth

Amendment's prohibition on cruel and unusual punishment, and the Court recommends that

Plaintiff's Eighth Amendment claim be dismissed. *See Maldonado v. Fischer*, No. 11-CV-

1091Sr., 2012 WL 4461647, at * 3, 2012 U.S. Dist. LEXIS 137634, at * 9 (W.D.N.Y. Sept. 24,

2012) (recognizing Second Circuit's determination that SORA's registration and community

notification provisions were not "punishments" within the meaning of the Ex Post Facto Clause

and concluding that accordingly, his allegations of cruel and unusual punishment under SORA

failed to state a claim); *see also Cain v. Michigan*, No. 14-12567, 2015 WL 249296, at * 7, 2015

U.S. Dist. LEXIS 5959, at * 18 (E.D. Mich. Jan. 20, 2015) (because the Michigan sex offender

registration act was found to be regulatory rather than punitive, plaintiff failed to state a claim for

cruel and unusual punishment under the Eighth Amendment).

**L.     Thirteenth Amendment**

Plaintiff claims that SORA constitutes "state sanctioned slavery" in violation of the

Thirteenth Amendment. (Dkt. No. 1 at ¶ 175.) Section 1 of the Thirteenth Amendment provides

that "[n]either slavery nor involuntary servitude, except as punishment for crime whereof the

party shall have been duly convicted, shall exist within the United States, or any place subject to

their jurisdiction." US Const. amend. XIII, § 2 provides that "Congress shall have the power to

enforce this article by appropriate legislation." The Court finds Plaintiff's Thirteenth Amendment claim to be frivolous and recommends dismissal.

**M.      Fourteenth Amendment Procedural Due Process[11]**

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972). When protected liberty or property interests are implicated, "the right to some kind of hearing is paramount." *Id*. at 569-70.

Although the issue of whether requiring an individual to register as a sex offender implicates a liberty interest does not appear to have been conclusively decided in this Circuit, there are district court decisions that have found that a stigma plus liberty interest is implicated when an individual is required to register under SORA, since the stigma attached may affect the registered person in other areas such as employment. *See Woe v. Spitzer*, 571 F. Supp. 2d 382, 387 (E.D.N.Y. 2008) (holding that SORA implicates a protected liberty interest) (citing *Doe v. Pataki*, 3 F.Supp. 2d 456 (S.D.N.Y. 1998)). Therefore, solely for purposes of this initial review, the Court will assume that Plaintiff possesses a cognizable stigma plus liberty interest.

Plaintiff's procedural due process claim nonetheless lacks merit. Once a liberty interest has been established, a plaintiff must show deprivation of that right without sufficient process. *Woe*, 571 F. Supp. 2d at 387. When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard. *Hamdi v. Rumsfeld*, 542 U.S. 507,

---

[11]   To the extent Plaintiff is challenging the level classification proceedings held before Judge Martusewicz, his procedural due process claim may be barred under the *Rooker-Feldman* doctrine. However, the Court does not have sufficient information before it to make that determination on initial review.

533 (2004) (plurality opinion). The right to a hearing to determine risk level, prior notice of the hearing, the right to appeal any determination, the right to an attorney during the proceedings and the right to discovery of evidence were established as a result of a litigation agreement between New York State and a class of sex offenders. *See Doe v. Pataki*, 481 F.3d 69, 77-79 (2d Cir. 2007) (finding that all the procedural safeguards suggested by the district court were implemented in the settlement and subsequent amendment to SORA and finding the settlement to be binding and valid); *United States v. Kimble*, 905 F.Supp. 2d 465, 475 (W.D.N.Y. 2012) (finding that the settlement put in procedural safeguards of notice and opportunity to be heard to bring SORA in compliance with due process demands); *Woe,* 571 F. Supp .2d at 389 (holding that SORA post-settlement did not violate procedural due process).

It seems clear that the SORA procedures for notice and an opportunity to be heard, assignment of counsel, and the right to appeal, Corr. Law § 168-n(3), which were afforded Plaintiff satisfied the Fourteenth Amendment's procedural due process requirements, and that his due process claim lacks merit.[12] (See Dkt. No. 1 at ¶¶ 37-43.) Therefore, the Court recommends that Plaintiff's Fourteenth Amendment procedural due process claim be dismissed upon initial

---

[12] Plaintiff has alleged in his complaint that he requested an appeal, but that his attorney failed to file an appeal claiming that the Plaintiff had no chance. (Dkt. No. 1 at ¶¶ 42-43.) The fact that Plaintiff alleges that his lawyer failed to file an appeal is insufficient to state a procedural due process claim since an appeal was available to him under SORA. *See Hefferan v. Corda*, 498 F. App'x 86, 88 (2d Cir. 2012) (finding that "a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies") (citation and internal quotation marks omitted); *Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.*, 620 F3d 146, 152-53 (2d Cir. 2010) ("The fact that a state proceeding is required by due process does not mean that Section 1983 provides a remedy for every error committed in the state proceeding. So long as state appellate remedies are available, a Section 1983 action is not an available vehicle for relief.")

review.

**N.  Fourteenth Amendment Substantive Due Process**

Inasmuch as Plaintiff makes reference to substantive rights throughout his complaint, the Court has liberally construed it to allege a substantive due process claim regarding his sex offender classification.  Substantive due process protects individuals against governmental action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense.  *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994).  "It is not enough that the government act be 'incorrect or ill-advised'; it must be conscience-shocking."  *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (citation omitted).  "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional."  *Id*. at 275.  To satisfy this standard a plaintiff must show that the government decision it challenges "was arbitrary or irrational or motivated by bad faith."  *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989).

In *Doe v. Pataki*, 120 F.3d at 1266, the Second Circuit noted that "[t]he legislature articulated two goals served by the SORA: (1) protecting members of the community, particularly their children by notifying them of the presence of individuals in their midst who may present a danger, and (2) enhancing law enforcement authorities' ability to investigate and prosecute future sex crimes."  Thus the motivation for the enactment of SORA was not arbitrary, irrational, or motivated by bad faith, but rather to protect New York State's vulnerable population and aid law enforcement by facilitating the monitoring of the whereabouts of sex offenders.  Therefore, Plaintiff's substantive due process argument is without merit, and the Court recommends dismissal upon initial review.

28

O.       **Equal Protection**

It is not entirely clear from his complaint whether Plaintiff is claiming that SORA violates his equal protection rights.  However, because of his pro se status, the Court has liberally construed his complaint to assert an equal protection claim.  The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law and guarantees that similarly situated persons be treated equally.  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  In order to prove an equal protection violation, plaintiff must demonstrate that "[he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citations omitted).

Convicted sex offenders have not been found to be a "suspect class" for equal protection purposes, and SORA is therefore subject to scrutiny under the rational basis test.[13]  *See Cutshall*, 193 F.3d at 482 (convicted sex offenders are not a suspect class).  "Unless the legislation classification under attack involves a suspect class, the classification need only be rationally related to a legitimate government goal to survive constitutional challenge."  *Id*. (citing *Chapman v. United States*, 500 U.S. 453, 465 (1991)).  "[L]egislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  *Cleburne*, 473 U.S. at 440.  Given the legislative purpose of SORA    protecting vulnerable children and aiding law enforcement    the Court cannot say that SORA is irrational and recommends that Plaintiff's equal protection claim be dismissed upon initial review.  *See*

---

[13]  Presumably those similarly situated to those subject to the requirements of SORA are criminal offenders who are not subject to the registration requirements of SORA.

*Cutshall,* 193 F.3d at 482 (dismissing claim that sex offender registration act violated plaintiff's equal protection rights); *Does v. Munoz*, 507 F.3d 961, 966 (6th Cir. 2007) (same).

### P.     Conclusion as to Plaintiff's Federal Claims

For the reasons explained above, the Court recommends that all of federal claims against Governor Cuomo and Senator Skelos, in both their official and individual capacities, be dismissed. While the Court is keenly aware that a *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Gomez,* 171 F.3d at 795, it finds that the problems with Plaintiff's federal claims under against the Defendants are substantive and cannot be cured by a better pleading. Therefore, the Court recommends that the dismissal of the complaint against Governor Cuomo and Senator Skelos be with prejudice.

The Court is cognizant of the fact that Plaintiff has included allegations in his complaint and in his request for a preliminary injunction that an officer of the Jefferson County Sheriff's Department who met with Plaintiff in August of 2005 was unwilling to list Plaintiff's address as "homeless" on the registration and verification form signed by Plaintiff. (Dkt. No. 3 at ¶¶ 13, 19-22.) Instead, the officer inserted an old public housing address for Plaintiff's family against Plaintiff's wishes, placing Plaintiff at risk of state and federal charges for providing an incorrect address. *Id.* at ¶ 19-22, 24. Neither Governor Cuomo nor Senator Skelos has been implicated in the August 2015 registration matter by the allegations in the complaint, and the Court has, therefore, not considered whether Plaintiff can state a federal claim with regard to the address issue. The Court therefore recommends that the District Court allow Plaintiff to amend his complaint to assert any federal claims he may have against properly named defendants with

regard to the Jefferson County Sheriff's Department registration matter, and to direct that in the event Plaintiff does file an amended complaint against the proper parties that it be referred to this Court for initial review under 28 U.S.C. § 1915(e)(2)(B).

**Q.	Plaintiff's State Law Claims**

Plaintiff has asserted numerous state law tort claims and a New York State Constitution claim against Governor Cuomo and Senator Skelos.  In light of the recommendation that all of Plaintiff's federal claims against Governor Cuomo and Senator Skelos be dismissed with prejudice, the Court also recommends that the District Court decline to exercise supplemental jurisdiction over Plaintiff's state law and state constitutional claims against those Defendants, without prejudice subject to refiling in state court and to reconsideration in the event the District Court does not accept this Court's recommendation for dismissal of Plaintiff's federal claims with prejudice.  *See Kolari v. New York Presbyterian Hosp.*, 455 F.3d 118, 120 (2d Cir. 2006).

**ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is granted; and it is hereby

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be dismissed in its entirety upon initial review pursuant to 18 U.S.C. § 1915(e)(2)(B); and it is further

**RECOMMENDED** that all of Plaintiff's federal claims against Defendants Cuomo and Skelos be dismissed with prejudice.  Those federal claims include Plaintiff's claims under:

1.	42 U.S.C. § 1983    violation of Plaintiff's rights under the First, Fourth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the United States Constitution;

2.	42 U.S.C. § 1981;

3.	42 U.S.C. § 1985;

4.     42 U.S.C. § 1986;

5.     42 U.S.C. § 1988;

6.     18 U.S.C. §§ 1581, 1584, 1589, 1590, 1594, 1595, 2201; and

7.     Criminal Interference with Right to Fair Housing under the FHA, 42 U.S.C. § 3601, *et seq.*; and it is further

**RECOMMENDED** that the District Court decline to exercise supplemental jurisdiction over Plaintiff's state law and state constitutional claims against Defendants Cuomo and Skelos (Causes of Action 15-23, 34), without prejudice, subject to refiling in state court and to reconsideration in the event the District Court does not accept this Court's recommendation for dismissal of Plaintiff's federal claims with prejudice; and it is further

**RECOMMENDED** that Plaintiff be granted leave to amend his complaint to assert any federal claims he may have against the proper defendants with regard to the issue concerning the failure to allow him to use the address "homeless" when he did his ninety day registration and verification under SORA in or about August 2015, and the inclusion against his wishes of an incorrect address on the registration signed by him, and direct that in the event Plaintiff does file an amended complaint that it be referred to this Court for initial review under 28 U.S.C. § 1915(e)(2)(B); and it is hereby

**ORDERED** that the Clerk provide Plaintiff with copies of all unpublished decisions cited herein in accordance with *LeBron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL</u>**

**PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72, 6(a).


Dated: November 9, 2015
       Syracuse, New York

                                      Thérèse Wiley Dancks
                                      United States Magistrate Judge

2015 WL 249296
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Derrick CAIN, Plaintiff,

v.

The People of the State of MICHIGAN,
Rick Snyder, Karen Johnson, and
Michigan State Police, Defendants.

No. 14–12567.  |  Signed Jan. 20, 2015.

**Attorneys and Law Firms**

Derrick Cain, Detroit, MI, pro se.

Erik A. Grill, Michigan Department of Attorney General,
Lansing, MI, for Defendants.

***OPINION AND ORDER GRANTING
DEFENDANTS' MOTION TO DISMISS***

PATRICK J. DUGGAN, District Judge.

**\*1** *Pro se* Plaintiff Derrick Cain instituted this civil rights
action against Defendants State of Michigan, Governor Rick
Snyder, Karen Johnson, and the Michigan State Police
(collectively, "Defendants") pursuant to 42 U.S.C. § 1983
on June 30, 2014. In his Complaint, Plaintiff challenges
the constitutionality of Michigan's Sex Offender Registration Act
("SORA" or "Act"), as amended in 2011, and seeks monetary
and equitable relief. Plaintiff claims that the Act's provisions
violate his Fourteenth Amendment due process rights, the
constitutional prohibitions on double jeopardy and *ex post
facto* laws, the Eighth Amendment, and also violate state law.

Presently before the Court is Defendants' Motion to Dismiss,
filed pursuant to Federal Rule of Civil Procedure 12(b)(6).
Plaintiff declined to respond to Defendants' Motion despite
being apprised of the timeframe in which to do so. Having
determined oral argument would not significantly aid the
decisional process, the Court dispensed with oral argument
pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).
For the reasons stated herein, the Court will grant Defendants'
Motion and dismiss Plaintiff's Complaint.

## I. BACKGROUND

### A. Statutory History

"In 1994, Congress passed the Jacob Wetterling Crimes
Against Children and Sexually Violent Offender Registration
Act, title 17, 108 Stat.2038, as amended, 42 U.S.C. § 14071,
which conditions certain federal law enforcement funding
on the States' adoption of sex offender registration laws and
sets minimum standards for state programs."*Smith v. Doe,*
538 U.S. 84, 89–90, 123 S.Ct. 1140, 1145, 155 L.Ed.2d 164
(2003). Although the federal statute gave the states three years
from September 1, 1994 within which to create registration
programs, 42 U.S.C. § 14071(f)(1) (1994), Michigan first
enacted SORA in 1994. [1] *Doe v. Snyder,* 932 F.Supp.2d 803,
807 (E.D.Mich.2013); *Akella v. Mich. Dep't of State Police,*
67 F.Supp.2d 716, 720 (E.D.Mich.1999).

The SORA

> requires individuals convicted of one
> of the enumerated criminal sexual
> offenses to register and to update their
> address within ten days of relocation.
> MICH. COMP. LAWS § 28.723(a),
> (b); MICH. COMP. LAWS § 28.729.
> In the event that an individual fails
> to register, the Act provides such
> conduct constitutes a felony. The
> Michigan Department of State Police
> is required to maintain a repository of
> the information compiled pursuant to
> the Act in the form of a computerized
> database. MICH. COMP. LAWS §
> 28.728.

*Akella,* 67 F.Supp.2d at 720. The law enforcement database,
which is distinct from the publically-accessible website,
contains a wealth of information about individuals required
to register. [2] *Compare*Mich. Comp. Laws § 28.727(1)
(delineating information required upon registration and kept
in a law enforcement database) with Mich. Comp. Laws §
28.727(2) (setting forth the required contents for the website.
The publically-accessible information kept on the website
includes:

**\*2** (a) The individual's legal name and any aliases, nicknames, ethnic or tribal names, or other names by which the individual is or has been known.

(b) The individual's date of birth.

(c) The address where the individual resides....

(d) The address of each of the individual's employers. For purposes of this subdivision, "employer" includes a contractor and any individual who has agreed to hire or contract with the individual for his or her services....

(e) The address of any school being attended by the individual and any school that has accepted the individual as a student that he or she plans to attend....

(f) The license plate number or registration number and description of any motor vehicle, aircraft, or vessel owned or regularly operated by the individual.

(g) A brief summary of the individual's convictions for listed offenses regardless of when the conviction occurred.

(h) A complete physical description of the individual.

(i) The photograph required under this act....

(j) The text of the provision of law that defines the criminal offense for which the sex offender is registered.

(k) The individual's registration status.

(l) The individual's tier classification.

Mich. Comp. Laws § 28.727(2). While there is overlap between the contents of the database and the website, it suffices to say that the database is far more exhaustive, as one would expect from a law enforcement tool. "Since its adoption [in 1994, the] SORA has undergone numerous amendments." *Doe,* 932 F.Supp.2d at 807.

In 1997, SORA was amended to require law enforcement agencies to make registry information available to the public during business hours. A 1999 amendment increased the number of offenses for which registration was required and mandated that a less-detailed version of the registry be made available to the public online.

SORA was again amended in 2002, 2004, and 2006. These amendments, among other things, increased reporting requirements for registrants; removed the registration requirement for individuals convicted under the HYTA after October 1, 2004; barred registrants from working, residing, or loitering within 1,000 feet of a school; and created a program whereby members of the public could be notified electronically when a sex offender moved into a particular zip code.

The most recent amendment to SORA came in 2011, which significantly altered the statute to comply with the federal Sex Offender Registration and Notification Act ("SORNA"), 42 U.S.C. § 16901, *et seq.* As amended in 2011, SORA now categorizes registrants into three tiers which determine the length of time individuals must register and the frequency with which they must report. Tier classifications are based solely on a registrant's offense and do not factor in an individualized determination of risk. There is no way to reduce one's tier classification or to remove oneself from the list. SORA 2011 extended the length of registration for most registrants, and individuals who were assigned to Tier III, Plaintiff[ ] included, are now required to register for life. The 2011 amendment also (1) expanded the in-person reporting requirement to require registrants to report to the police station within three days of establishing any new electronic mail address, instant message address, or other designation used in Internet communications or postings; (2) expanded registrants' reporting obligations before traveling; and (3) increases the number of times registrants must regularly report in-person each year.

**\*3** *Id.*

**B. Plaintiff**

Plaintiff was convicted of criminal sexual conduct in the third degree on May 16, 1997. (Compl.¶ 10.) Plaintiff served a term of incarceration and was released from custody on February 15, 2011. (*Id.*) As the preceding section makes clear, SORA was amended several times in the years after Plaintiff's conviction. These amendments impacted Plaintiff in various ways, one of which is that at the time of his conviction, Plaintiff was only required to register as a sex offender for ten years, whereas now, Plaintiff is classified as a Tier III offender and must, therefore, register for the duration of his natural life.

As a result of being required to register, Plaintiff lost a job with an employer who "was aware of his background[ ]" but succumbed to pressure from community members who

"brought complaints based on subjective fears" of Plaintiff's sex-offender status. (*Id.* ¶ 15.) Plaintiff asserts that the public nature of the sex offender registry has rendered him susceptible to other harms as well. For instance, "[P]laintiff has been followed, his house was shot up in 2012 while he was in it, several breakin [*sic* ] attempts have occurred [.]" (*Id.*) Moreover, "the SORA obligations deprive [P]laintiff of any private life, and are tantamount to being displayed in a video zoo, where [P]laintiff can be tracked, hunted[,] ... monitored, harassed, in all of his every day activities, where he works, travels, ... lives" and further deprive Plaintiff of his "ability to hide or be left alone[ .]" (*Id.*)

### C. Legal Proceedings

Plaintiff instituted the present action on June 30, 2014 challenging the 2011 amendments to SORA, naming as defendants the State of Michigan and the Michigan State Police, as well as Governor Snyder and Karen Johnson, both of whom are named in their individual and official capacities.[3]

Although Plaintiff's Complaint does not contain separate counts, he appears to generally claim that the retroactive nature of SORA and its extensive reporting requirements violate his constitutional rights. The Court construes Plaintiff's pleading as containing claims arising under: (1) the *Ex Post Facto* Clause of the United States Constitution; (2) the Double Jeopardy Clause of the Fifth Amendment; (3) the Eighth Amendment; (4) the substantive component of the Fourteenth Amendment's Due Process Clause; and (5) unspecified state laws.

On November 12, 2014, Defendants collectively moved to dismiss the entire action pursuant to Federal Rule of Civil Procedure 12(b) (6). Plaintiff declined to file a response.

## II. GOVERNING LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b) (6) allows the Court to assess whether a plaintiff's pleadings state a claim upon which relief may be granted. As articulated by the Supreme Court of the United States, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 555,

570, 127 S.Ct. 1955, 1974, —— L.Ed.2d ——, —— (2007)). This facial plausibility standard requires claimants to put forth "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the requisite elements of their claims. *Twombly,* 550 U.S. at 557, 127 S.Ct. at 1965. Even though a complaint need not contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level." *Ass'n of Cleveland Fire Fighters v. City of Cleveland,* 502 F.3d 545, 548 (6th Cir.2007) (citation omitted).

**\*4** While courts are required to accept the factual allegations in a complaint as true, *Twombly,* 550 U.S. at 556, 127 S.Ct. at 1965, the presumption of truth does not apply to a claimant's legal conclusions, *Iqbal,* 556 U.S. at 678, 129 S.Ct. at 1949. Therefore, to survive a motion to dismiss, a plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."*Ass'n of Cleveland Fire Fighters,* 502 F.3d at 548 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1964–65) (internal citations and quotations omitted).

Compared to formal pleadings drafted by lawyers, a generally less stringent standard is applied when construing the allegations pleaded in a *pro se* complaint. *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972); *see also Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (reaffirming rule of more liberal construction of *pro se* complaints less than two weeks after issuing *Twombly* ). The leniency with which courts construe *pro se* plaintiffs' complaints, however, does not abrogate the basic pleading requirements designed to ensure that courts do "not have to guess at the nature of the claim asserted."*Wells v. Brown,* 891 F.2d 591, 594 (6th Cir.1989).*Pro se* plaintiffs still must provide more than bare assertions of legal conclusions to survive a motion to dismiss. *Grinter v. Knight,* 532 F.3d 567, 577 (6th Cir.2008) (citing *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988)). Likewise, "liberal treatment of *pro se* pleadings does not require lenient treatment of substantive law."*Durante v. Fairlane Town Ctr.,* 201 F. App'x 338, 344 (6th Cir.2006).

## III. ANALYSIS

Defendants seek dismissal of Plaintiff's Complaint on several different grounds. First, Defendants contend that Plaintiff's

Complaint fails to put them on notice of the nature of the claims Plaintiff has brought and the grounds upon which those claims rest. [4] Second, Defendants contend that the Eleventh Amendment to the United States Constitution bars Plaintiff's claims against the State of Michigan and the Michigan State Police, as well as Plaintiff's claims seeking monetary relief against Snyder and Johnson in their official capacities. Next, Defendants argue that Snyder and Johnson are shielded from suit in their individual capacities by virtue of the doctrine of qualified immunity. [5] Fourth, and lastly, Defendants contend that Plaintiff has failed to state a claim that the SORA, or any of its subsequent amendments, abridges his constitutional rights, thus rendering him incapable of establishing the requisite elements of a claim pursuant to § 1983. [6]

## A. Eleventh Amendment Immunity

### 1. The State of Michigan and the Michigan State Police

Defendants claim that Plaintiff's maintenance of the suit against the State of Michigan and the Michigan State Police are barred by the Eleventh Amendment, as the State's immunity from suit has been neither abrogated nor waived.

**\*5** The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign state." U.S. Const. amend. XI. This Amendment has been interpreted as "an explicit limitation of the judicial power of the United States." *Missouri v. Fiske,* 290 U.S. 18, 25, 54 S.Ct. 18, 20, 78 L.Ed. 145 (1993). In the absence of consent or congressional abrogation, a suit in which a State or one of its departments or agencies is named as a defendant is proscribed by the Eleventh Amendment. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984) (citing *Fla. Dep't of Health & Rehab. Serv. v. Fla. Nursing Home Ass'n,* 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981)); *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 66, 109 S.Ct. 2304, 2309–10, 105 L.Ed.2d 45 (1989). The applicability of the Eleventh Amendment is a question of law. *Timmer v. Mich. Dep't of Corrs.,* 104 F.3d 833, 836 (6th Cir.1997).

Here, Plaintiff has not identified any facts that would support a finding that the State has waived its immunity or that Congress has expressly overridden it. As such, the Court concludes that Plaintiff's claims against the State of Michigan and the Michigan State Police are barred by the Eleventh Amendment. [7] *See, e.g., Pennhurst,* 465 U.S. at 100, 104 S.Ct. at 908 ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.")."This jurisdictional bar applies regardless of the nature of the relief sought." *Id.; Cory v. White,* 457 U.S. 85, 91, 102 S.Ct. 2325, 2329, 72 L.Ed.2d 694 (1982) ("[T]he Eleventh Amendment by its very terms clearly applies to a suit seeking an injunction, a remedy available only from equity."). Further, the Eleventh Amendment applies even to state law claims sought to be brought in federal court under pendent jurisdiction. *Pennhurst,* 465 U.S. at 120, 104 S.Ct. at 919 ("The Eleventh Amendment should not be construed to apply with less force to [pendent] jurisdiction than it does to the explicitly granted power to hear federal claims."). As such, the Court must dismiss the State of Michigan and the Michigan State Police from this lawsuit.

### 2. Defendants Snyder and Johnson

Defendants also seek dismissal of Plaintiff's claims for monetary damages against Defendants Snyder and Johnson, arguing that the State is the "real, substantial party in interest and is entitled to invoke its sovereign immunity." *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974) (quotation omitted). The Court agrees. Accordingly, Defendants Snyder and Johnson are dismissed from the action to the extent that Plaintiff seeks retrospective monetary relief from them in their individual capacities.

## B. Plaintiff's Individual Claims

### 1. Ex Post Facto Clause

**\*6** Defendants argue that Plaintiff's *ex post facto* claim fails as a matter of law because the SORA, as amended in 2011, is not a criminal statute but rather is a civil, nonpunitive regulatory scheme designed to protect the public, not punish offenders.

The Constitution's *Ex Post Facto* Clause provides, in pertinent part: "No state shall ... pass any ... ex post facto Law[.]" U.S. Const. art. I, § 10, cl. 1. This clause prohibits legislative enactments constituting retroactive punishment. *Smith,* 538 U.S. at 92, 123 S.Ct. at 1146. "To fall within the ex post facto prohibition, a law must be retrospective-that is it must apply to events occurring before its enactment-and it must disadvantage the offender affected by it by altering the definition of criminal conduct or increasing the punishment

for the crime."*Cutshall v. Sundquist,* 193 F.3d 466, 476 (6th Cir.1999) (quoting *Lynce v. Mathis,* 519 U.S. 433, 441, 117 S.Ct. 891, 896, 137 L.Ed.2d 63 (1997) (internal quotation marks and citation omitted)).

Judicial inquiry into the underlying purpose of legislative enactments challenged as violative of the *Ex Post Facto* Clause requires an assessment of "whether the legislature meant the statute to establish 'civil' proceedings."*Smith,* 538 U.S. at 92, 123 S.Ct. at 1146–47 (quotation omitted). As the Supreme Court explained in *Smith:*

> If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is " 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' " *Ibid.* (quoting *United States v. Ward,* 448 U.S. 242, 248–249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). Because we "ordinarily defer to the legislature's stated intent," *Hendricks, supra,* at 361, " 'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty," *Hudson v. United States,* 522 U.S. 93, 100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (quoting *Ward, supra,* at 249); *see also Hendricks,supra,* at 361; *United States v. Ursery,* 518 U.S. 267, 290, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996); *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 365, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984).

*Smith,* 538 U.S. at 92, 123 S.Ct. at 1147.

Numerous federal courts, including the Supreme Court, have rejected the argument that sex offender registration and notification constitutes an *ex post facto* punishment forbidden by the Constitutional prohibition against retroactive punishment. *See, e.g., Smith,* 538 U.S. at 105–06, 123 S.Ct. at 1154 (holding, in a case of first impression, that the State of Alaska's sex offender act "is nonpunitive, and its retroactive application does not violate the *Ex Post Facto* Clause"); *Cutshall,* 193 F.3d at 477 ("Because the [Tennessee] Act imposes no punishment, the *Ex Post Facto* Clause is not implicated."). Indeed, the Honorable Robert H. Cleland, another judge in this district, issued an Opinion and Order in March of 2013 addressing the constitutionality of the 2011 amendments to SORA. Upon exhaustively analyzing the plaintiffs' *ex post facto* claim under the framework set forth in *Smith* and *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963),

Judge Cleland concluded that the "SORA, as amended in 2011, is a regulatory, not criminal statute. Accordingly, [the plaintiffs' *ex post facto* challenge] must be dismissed because SORA does not, as a matter of law, violate the *Ex Post Facto* Clause."*Doe,* 932 F.Supp.2d at 814.

**\*7** Having reviewed the considerable case law on the *ex post facto* implications of sex offender registration and notification statutes, the Court finds Judge Cleland's analysis and rationale persuasive. [8] Therefore, the Court concludes that Plaintiff's challenge to the 2011 amendments to SORA fails to state a claim under the Constitution's *Ex Post Facto* Clause.

### 2. Double Jeopardy Clause

To the extent that Plaintiff is arguing that the Act punishes him twice for the same offense in violation of the Fifth Amendment's Double Jeopardy Clause, [9] the Sixth Circuit upheld the State of Tennessee's sex offender registration act against a double jeopardy challenge in *Cutshall v. Sundquist,* 193 F.3d 466, 473–76 (6th Cir.1999). Relying on the seven-factor test articulated in *Kennedy,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644—the same test employed in the *Ex Post Facto* Clause setting—the panel concluded "that the Act does not violate the prohibition against double jeopardy."*Cutshall,* 193 F.3d at 476.

As established in relation to Plaintiff's *ex post facto* claim, the SORA's purpose is regulatory, not punitive. As such, it does not violate the Double Jeopardy Clause, which "protects only against the imposition of multiple *criminal* punishments for the same offense, ... and then only when such occurs in successive proceedings."*Id.* at 473 (emphasis in original) (quotation omitted).

### 3. Eighth Amendment

Plaintiff alleges that the SORA violates the Eighth Amendment. (Compl.¶ 20.) This amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."U.S. Const. amend. VIII. The contours of Plaintiff's Eighth Amendment claim are not entirely clear, as Plaintiff alleges that enactment of the SORA created "a pervasive risk of harm where plaintiff's house was shot up with plaintiff clinging to the floor for his life, loss of plaintiff's job, attempts to break in his house and him being followed have occurred, defendants had actual knowledge of the subjective risk and failed to take measures and in fact continue to create greater risk of harm

where the information plaintiff is obligated to give is given to the public and not limited to law enforcement, leaving plaintiff in continuous fear for his safety, creating a greater problem instead of solving it."(Compl.¶ 20.)

To the extent that Plaintiff argues that the Act violates the Eighth Amendment's prohibition against cruel and unusual punishment, the Court has already concluded that the Act is regulatory in nature, not punitive. In other words, the Act is not punishment, therefore rendering the Eighth Amendment inapplicable. *Cutshall,* 193 F.3d at 477 ("We have already concluded that the Act does not impose punishment; it is regulatory in nature. Therefore, it does not violate the Eighth Amendment's prohibition on cruel and unusual punishment.").

The Court is mindful of its duty to construe *pro se* pleadings more liberally than those drafted by attorneys. While not required to create arguments on behalf of unrepresented litigants, the Court notes that the allegations set forth in Plaintiff's Complaint are capable of being construed as alleging a claim arising from the substantive protections of the Fourteenth Amendment's Due Process Clause. [10] However, to the extent such a construction is possible, the claim fails as a matter of law because "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cnty. Dep't of Social Servs.,* 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989).

### 4. Right to Privacy

 **\*8** According to Plaintiff, the Act infringes on constitutionally protected privacy interests by compiling and disseminating "information that is not a matter of public record[.]" (Compl.¶ 18.) Plaintiff complains that the publically-accessible registry contains highly-private details of his personal life, such as "[his] personal property, private education, medical records, employers, contractors, routes he travels, e-mail address, home address, employer address, where he goes, cars[ ] he may own or use, his address, licences [*sic* ], as well as the very right to control the use of one's own name, picture, or likeness [ ] and to prevent another from using it for commercial benefit without plaintiff's consent." [11] (*Id.*) According to Plaintiff, "[t]his

unjustified exploitation an[d] intrusion into one's personal activities impedes the right to just be left alone."(*Id.*)

As an initial matter, Plaintiff appears to misapprehend the distinction between the information contained in the Michigan State Police law enforcement database and the information made available to the public on the internet website. Michigan Compiled Laws § 28.728, the portion of the SORA describing the information sex offenders must provide upon registering under the Act, makes clear that the information that the Michigan State Police must maintain in "a computerized law enforcement database" is more expansive than the information contained on the "public internet website[,]" which, it bears emphasizing, is "separate from the law enforcement database[.]"Mich. Comp. Laws § 28.728(1)(2). The publically-accessible website does not, contrary to Plaintiff's assertions, contain Plaintiff's medical records, email address, or professional license, nor does it describe the routes Plaintiff often travels or places he frequents. The website does, however, provide information regarding Plaintiff's place of residence, employment, and educational institution, as well as the license plate number and description of any motor vehicle owned or regularly operated by him. The Court must therefore determine whether the information contained on the website infringes Plaintiff's constitutionally-protected privacy rights, rights stemming from the substantive component of the Fourteenth Amendment's Due Process Clause.

"The substantive component of the Due Process Clause protects 'fundamental rights' that are so 'implicit in the concept of ordered liberty' that " 'neither liberty nor justice would exist if they were sacrificed.' " *Doe XIV v. Mich. Dep't of State Police,* 490 F.3d 491, 499 (6th Cir.2007) (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)). Rights qualifying for such constitutional protection include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Id.* (quoting *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997) (internal citations omitted)). While the Supreme Court has intimated that substantive due process may protect "the individual interest in avoiding disclosure of personal matters," *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977), the right has been construed narrowly, and the Sixth Circuit in *Cutshall* indicated that the constitutional right of privacy "does not provide" sex

offenders "with a right to keep [their] registry information private," 193 F.3d at 481.

**\*9** Each federal appellate court considering substantive due process arguments against the registration requirement of sex-offender registries has found that the laws mandating the registry are constitutional. *Doe XIV,* 490 F.3d at 500 (citing *Doe v. Moore,* 410 F.3d 1337, 1345 (11th Cir.2005) (holding that the right to refuse under a sex-offender statute is not a fundamental rights); *Doe v. Tandeske,* 361 F.3d 594, 597 (9th Cir.2004) (per curiam) ("[P]ersons who have been convicted of serious sex offenses do not have a fundamental right to be free from ... registration and notification requirements...."); *Gunderson v. Hvass,* 339 F.3d 639, 643 (8th Cir.2003) (concluding that the sex-offender registration statute does not infringe the plaintiff's fundamental right to a presumption of innocence); *Paul P. v. Verniero,* 170 F.3d 396, 405 (3d Cir.1999) (holding that the effects of registering under a sex-offender registration statute fail "to fall within the penumbra of constitutional privacy protection")). Indeed, the Sixth Circuit has "reiterate[d] that 'not all rights of privacy or interests in nondisclosure of private information are of constitutional dimension, so as to require balancing government action against individual privacy.' " *Id.* (quoting *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1062 (6th Cir.1998) (analyzing the substantive due process rights of undercover police officers in not having their personal identifying information disclosed to criminal defendants)). Because no fundamental right is implicated, the Court applies rational basis review. *Id.* at 501.

Plaintiff's claim that widespread dissemination of information concerning his conviction of a sex offense is somehow violative of his right to privacy ignores the inescapable fact that this information is already the subject of public record. With respect to the other information contained on the website, this Court has previously held that "the dissemination of an offender's address does not violate any constitutionally protected privacy interests."*Akella,* 67 F.Supp.2d at 730. This is because "the 'nature and significance' of the state's interest justifies the intrusion on [Plaintiff's] interests."*Id.* (quotation omitted). The remaining information on the website withstands rational basis review because the public's interest in preventing and protecting against future criminal sexual acts by convicted sex offenders justifies the collection and dissemination of the website's contents. *Doe XIV,* 490 F.3d at 501.

Accordingly, the Court rejects Plaintiff's substantive due process challenge to the SORA.

## 5. State Law Claims

Plaintiff raises two claims that appear to rest in state law: a claim that sex offender registration "encroaches on the final judgment of the sentencing court," therefore violating separation-of-powers principles, and a claim that requiring his signature on registration forms creates some kind of "unconscionable agreement." (Compl.¶¶ 19, 21.)

**\*10** Having dismissed the federal causes of action, the Court declines to exercise supplemental jurisdiction over the state law claims referenced in the Complaint. *See*28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction ... if ... the district court has dismissed all claims over which it had original jurisdiction.").

## IV. CONCLUSION AND ORDER

For the reasons stated herein, the Court concludes that Plaintiff's constitutional challenges to the SORA fail to state a plausible claim for relief pursuant to 42 U.S.C. § 1983.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss is **GRANTED** and Plaintiff's federal constitutional claims are **DISMISSED WITH PREJUDICE;**

**IT IS FURTHER ORDERED** that Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE** to Plaintiff's right to re-file the claims in state court.

## All Citations

Slip Copy, 2015 WL 249296

Footnotes

1    By 1996, every State, the District of Colombia, and the Federal Government had enacted some variation of Megan's Law." *Smith,* 538 U.S. at 8990, 123 S.Ct. at 1145.

2    "The SORA, as it was first enacted, was designed as a tool solely for law enforcement agencies, and registry records were kept confidential. 1994 Mich. Pub. Acts 295 ('[A] registration is confidential and shall not be open to inspection except for law enforcement purposes.'). As of September 1, 1999, however, the SORA was amended to create the [State of Michigan's Public Sex Offender Registry], which can be accessed by anyone via the internet."*Doe XIV v. Mich. Dep't of State Police,* 490 F.3d 491, 495 (6th Cir.2007).

3    Defendants have indicated that Karen Johnson "is an employee of the Michigan State Police and is the manager of the Sex Offender Registration united within the Department of State Police."(Defs.' Br. 2 n. 1.)

4    The Court does not address this line of argumentation, as it is fairly clear what Plaintiff is complaining of. While it is true that "[t]here are no factual allegations stating what actions either Governor Snyder or Karen Johnson performed[,]" given their respective positions, the Court is able to draw the necessary inferences regarding why Plaintiff might have named them as defendants in the present action.

5    Unlike the Eleventh Amendment, a defendant's invocation of the defense of qualified immunity is not jurisdictional. Because the Court ultimately concludes that Plaintiff has failed to state a viable legal claim under any theory he has set forth in his pleading, the Court need not address Defendants' contention that Governor Snyder and Johnson are entitled to qualified immunity.

6    In order to prevail on a § 1983 claim, a plaintiff must establish: "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law."*Miller v. Sanilac Cnty.,* 606 F.3d 240, 247 (6th Cir.2010) (quotation omitted).

7    The Michigan State Police is a principal department of the State of Michigan. Mich. Const. art. V, § 2 (1963).

8    The Court notes that it has previously rejected an *ex post facto* challenge to the SORA, *Akella,* 67 F.Supp.2d at 733–34, and references Judge Cleland's more recent opinion because it addresses the 2011 amendments to the Act.

9    The Double Jeopardy Clause of the Fifth Amendment provides, in relevant part, "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb."U.S. Const. amend. V. The Fifth Amendment applies to the states through the Fourteenth Amendment's Due Process Clause and the doctrine known as incorporation. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

10    The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law[.]"U.S. Const. amend. XIV, § 1.

11    The Court notes that it is entirely unclear from the Complaint how the website commercially exploits images of sex offenders.

---

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.    8

2015 WL 1246058
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Devin KEITT, Plaintiff,

v.

T. HAWK et al., Defendants.

No. 9:13–cv–850 (GLS/ATB). | Filed
Jan. 8, 2015. | Signed March 18, 2015.

**Attorneys and Law Firms**

Devin Keitt, of Counsel, Stormville, NY, for the Plaintiff.

Hon. Eric T. Schneiderman, Michael G. McCartin, New York State Attorney General, Assistant Attorney General, of Counsel, Albany, N.Y. for the Defendants.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Devin Keitt commenced this action against defendants T. Hawk, M. Lira, D. Uhler, J. Otis, D. Rock, B. Fischer, J. Bellnier, D. Martuscello, P. Melecio, C. Miller, D. Ali, A. Perez, E. Killar, the State of New York, and the New York State Department of Correction/Community Supervision (DOCCS), pursuant to 42 U.S.C. § 1983, alleging violations of the Religious Land Use and Institutionalized Persons Act [1] (RLUIPA), the Americans with Disabilities Act [2] (ADA), the Rehabilitation Act, [3] and the First, Eighth, and Fourteenth Amendments. (*See generally* 2d Am. Compl., Dkt. No. 38.)

On March 21, 2014, defendants filed a motion for summary judgment. (Dkt. No. 67.) Keitt filed a response and a cross motion for summary judgment. (Dkt. No. 73.) In a Report–Recommendation (R & R) issued on January 8, 2015, Magistrate Judge Andrew T. Baxter recommended that defendants' motion for summary judgment be granted in its entirety, Keitt's cross motion be denied, and Keitt's second amended complaint be dismissed. (Dkt. No. 79.) Pending are Keitt's objections to the R & R. (Dkt. No. 82.) For the reasons that follow, the R & R is adopted in its entirety.

### II. *Background*

Keitt is an inmate, currently in the custody of DOCCS, and, during the time periods relevant to his claims, was housed at Upstate Correctional Facility and, later, Coxsackie Correctional Facility. (Defs.' Statement of Material Facts (SMF) ¶¶ 1, 2, 17, Dkt. No. 67, Attach. 25.) Keitt, a Muslim, suffers from dyslexia and diabetes, which requires him to take medication three times a day with food. (*Id.* ¶ 2; 2d Am. Compl. ¶¶ 16–17, Dkt. No. 38.) Thus, he cannot fast during Ramadan. (Defs. SMF ¶¶ 3–4; 2d Am. Compl. ¶¶ 18–19.) Despite his inability to fast, Keitt alleges that, while housed at Upstate on September 1, 2008 and in August 2010, he was not permitted to participate in the special meal provided after sundown to inmates who fasted during the day. (2d. Am.Compl.¶¶ 20–21.) He claims that he was denied this meal because of his disability, in violation of his First Amendment right to freedom of religion, Fourteenth Amendment right to equal protection, the ADA, and RLUIPA. (*Id.* ¶¶ 20, 30, 34.) Keitt also claims that he was retaliated against, also in violation of the First Amendment, when Hawk "carried out a threat" to prevent him from participating in the special meal after he indicated that he intended to file a lawsuit. (*Id.* ¶ 31.)

After he was transferred to Coxsackie, Keitt alleges that he was not permitted to wear religious headgear and clothing at all times-including throughout the facility and on outside trips. (*Id* . ¶¶ 112–18, 128–34.) He claims that this violates equal protection because he is only permitted to wear religious garb "at one place" and at religious services, but inmates who are Sikhs are permitted to wear their turbans at all times. (*Id.* ¶¶ 11516, 128–29.) Additionally, because he is dyslexic and cannot read, Keitt claims that he is entitled to be provided with "reasonable accommodation" of religious "books on tape" or "auxiliary aides (sic)" while he attends religious classes. (*Id.* ¶¶ 122–27.) Keitt further claims that Ali, a Muslim chaplain, denied Keitt's requests for those devices, and also, allegedly, retaliated against him when he refused to put Keitt on the call-out for Friday religious services after Ali learned that Keitt filed a grievance against him. (*Id.* ¶¶ 207–08, 210.)

### III. *Standard of Review*

**\*2** Before entering final judgment, this court reviews report and recommendation orders in cases it has referred to a magistrate judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo.See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at \*4–5.

### IV. *Discussion*

In his R & R, Judge Baxter first recommended that Keitt's claims regarding the Ramadan meal in 2008 be dismissed as time barred by the three-year statute of limitations governing claims arising under § 1983 because Keitt did not file his complaint until March 28, 2012. (Dkt. No. 79 at 8–11 (citing *Owens v. Okure,* 488 U.S. 235, 250–51, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989)).) With respect to the remainder of Keitt's religious diet claims arising from his stay at Upstate, Judge Baxter recommended that those claims also be dismissed because the named defendants weren't personally involved in decisions regarding inmates' diets, religious or otherwise. [4] (*Id.* at 11–15.) Next, Judge Baxter recommended dismissing Keitt's claims regarding his religious clothing, books on tape, and ability to attend religious services because Keitt failed to exhaust his administrative remedies, and, even if Keitt properly exhausted, these claims fail on the merits. (*Id.* at 25–37.) Finally, Judge Baxter recommended dismissal of Keitt's remaining claims under §§ 1981 and 1985, again, for failure to allege personal involvement. (*Id.* at 37–38.)

Here, in his objections, Keitt utterly fails to identify errors with any specific portion of the R & R. (*See generally* Dkt. No. 82 .) Instead, Keitt renews his motion to appoint counsel, [5] (*id.* at 11), erroneously contends that he was denied the opportunity to amend his complaint, (*id.; see* Dkt. Nos. 1, 31, 38), and otherwise simply re-states the facts as he views them and regurgitates arguments he has already made, (Dkt. No. 82 at 1–10), all of which Judge Baxter thoroughly considered in his R & R, (*compare id., with* Dkt. No. 73 at 3–7). These "objections" are not sufficient to trigger *de novo* review. Accordingly, consistent with the standards set forth in *Almonte,* 2006 WL 149049, at \*3–5, the court has carefully reviewed the record, found no clear error in the R & R, and adopts it in its entirety.

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's January 8, 2015 Report–Recommendation (Dkt. No. 79) is ADOPTED in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 67) is **GRANTED;** and it is further

**\*3 ORDERED** that Keitt's cross motion for summary judgment (Dkt. No. 73) is **DENIED;** and it is further

**ORDERED** that Keitt's renewed motion to appoint counsel (Dkt. No. 82 at 11) is **DENIED;** and it is further

**ORDERED** that Keitt's second amended complaint (Dkt. No. 38) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants have violated his First Amendment right to practice his religion; his rights under the Religious Land Use and Institutionalized Persons Act, ("RLUIPA"), 42 U.S.C. § 2000cc–1(a); the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; and the Rehabilitation Act, 29 U.S.C. § 794(a). (Amended Complaint "AC") (Dkt. No. 38). Plaintiff also cites 42 U.S.C. §§ 1981, 1985, 1986, and 1988 as bases for his claims. (AC ¶ 1). Finally, plaintiff claims that defendants have violated his First Amendment Free Speech rights; his Eighth Amendment right

to be free from cruel and unusual punishment, his right to Equal Protection, and his right to Due Process. Plaintiff seeks injunctive and substantial monetary relief. (AC at 63–64).

Presently before the court is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 67). Plaintiff has responded in opposition to the motion and has cross-moved for summary judgment in his favor. (Dkt. No. 73). Defendants have responded in opposition to plaintiff's cross-motion. (Dkt. No. 74). Plaintiff has filed some additional documents in support of his motion. (Dkt. No. 76). For the following reasons, this court agrees with defendants and will recommend granting their motion for summary judgment and denying plaintiff's cross-motion for summary judgment.

## DISCUSSION

**I. Facts and Contentions**

This case was transferred from the Southern District of New York on July 18, 2013, after being filed on March 28, 2012. [1] (Complaint "Compl.") (Dkt. No. 1). Plaintiff filed his second amended complaint ("SAC") March 18, 2013. [2] (Dkt. No. 38). The second amended complaint lists fifteen defendants in the caption, eleven defendants in the section entitled "Parties," and thirteen defendants in the body of the second amended complaint. (*See* SAC Caption; ¶¶ 4–12; 15, 37, 53, 70, 83, 97, 136, 150, 172, 187, 205, 236, 250). The caption lists the following defendants: T. Hawk; M. Lira; D. Uhler; J. Otis; D. Rock; B. Fischer; J. Bellnier; D. Martuscello; P. Melecio; C. Miller; D. Ali; A. Perez; E. Killar; State of New York; and the New York State Department of Correction and Community Supervision ("DOCCS").

**\*4** Two of the defendants in the caption of the complaint (A. Perez [3] and E. Killar [4]) are not even mentioned in the body of the complaint. In addition, defendants Miller, Martusciello, Melecio, Perez, Killar, and Bellnier have not been served with the original or the amended complaint. [5] The remaining defendants who have been served are: T. Hawk; M. Lira; D. Uhler; J. Otis; D. Rock; B. Fischer; DOCCS; State of New York; and Dr. Ali. The claims relating to plaintiff's Ramadan meal allegations occurred at Upstate Correctional Facility ("Upstate"), while his religious clothing claims are asserted against defendants at Coxsackie Correctional Facility ("Coxsackie"). Defendants Fischer and Bellnier are supervisory defendants, who work or worked [6] in Albany. [7]

## A. Defendants Fischer, State of New York, and DOCCS and Upstate Defendants: Hawk, Lira, Uhler, Otis, Rock

Plaintiff alleges that he is of the Muslim faith, is dyslexic, cannot read or write, is a Type–A Diabetic, and has a bullet lodged in his head. Plaintiff states that he must take medication with food three times per day. (SAC ¶¶ 16–17). Plaintiff states that if he does not take his medication with food, he becomes ill. Plaintiff states that because of these medical restrictions, he cannot participate in the fasting required during Ramadan. (SAC ¶¶ 18–19). Notwithstanding his inability to fast, plaintiff claims that he should be able to "observe the Ramadan fast by receiving Ramahdan [sic] food with everybody else...." (SAC ¶ 19). Plaintiff alleges that on September 1, 2008 and in August of 2010, defendants did not allow plaintiff to obtain the special meal "because of his disability." (SAC ¶ 20). The special meal is served after sundown, to inmates who have fasted during the day. Plaintiff claims that this policy violates his First Amendment rights and his rights under RLUIPA. Plaintiff also claims that providing plaintiff the extra meal at Upstate would be "accommodating" plaintiff's disability under the ADA. (SAC ¶ 30). Plaintiff alleges that defendants Hawk, Lira, and Uhler "conspired" to deprive plaintiff of Equal Protection or "Privileges and Immunities," and states that there is some "racial or perhaps otherwise class based invidious discriminatory animus."(SAC ¶ 34). Plaintiff also attempts to allege some sort of "retaliation" by defendant Hawk by claiming that he "carried out a threat" to prevent plaintiff from participating in the required feast because plaintiff "indicated an intention" to file a lawsuit for excluding him from this "religious experience." (SAC ¶ 31).

Plaintiff repeats almost identical paragraphs against defendants M. Lira, the Deputy Superintendent for Programs at Upstate; D. Uhler, the Upstate Deputy Superintendent of Security; and J. Otis, the Deputy Superintendent for Administration at Upstate, including the allegation that defendants Lira, Uhler, and Otis carried out a "threat" because plaintiff stated his "intention" to file a law suit. (SAC ¶¶ 37–51 (Lira), 53–68 (Uhler), 70–81 (Otis)). The claims against defendant Rock are also identical, except that plaintiff alleges defendant Rock's involvement only as to the 2010 incident. (SAC ¶ 83, 84–95).

**\*5** Plaintiff claims that former DOCCS Commissioner Fischer was responsible for the unconstitutional conduct of his subordinates because he "failed to follow guidelines implementing proper procedure and policies to ensure/ enforce [state and federal laws and directives]." (SAC ¶ 100).

Plaintiff claims that this defendant was "made aware" of the violations based upon "appeals from C.O.R .C.," and that defendant Fischer should have known that there were disabled inmates who needed "accommodations." (SAC ¶ 103).

### B. Defendants Fischer, Bellnier, State of New York, and DOCCS and Coxsackie Defendants: Martuscello, Melecio, Miller, and Ali

Plaintiff repeats the religious meal claims against defendant Fischer, but adds claims that plaintiff is not allowed to wear his religious headgear, known as a kefiya, turban, faus, or fezs at all times. (SAC ¶¶ 112–18). These religious clothing claims originated after his transfer to Coxsackie. He makes the same claims about his religious robe or Jâlâbiyah. (SAC ¶¶ 128–34). Plaintiff has requested permission to wear these head coverings "throughout the facility and on outside trips."(SAC ¶¶ 118, 132). Plaintiff states that the turban must be nine feet long, and the kefiya may be 52 by 52 or 72 by 72 inches. (SAC ¶ 120). Plaintiff states that he is only allowed to wear these head coverings "in one place" and at religious services, but those imams who are Sikhs are allowed to wear their turban headgear at all times. (SAC ¶¶ 115–16). Plaintiff alleges that this shows intentional discrimination against Muslims.

Plaintiff also alleges that because he is dyslexic and cannot read, he is entitled to be provided with the "reasonable accommodation" of religious "books on tape" or "auxiliary aides [sic]," while attending religious classes. (SAC ¶¶ 122–27). Plaintiff claims that he informed defendant Fischer that plaintiff "sincerely believes" that he must wear his Jâlâbiyah Religious Robe. Defendants allow him to wear the robe only "at one place" in the facility and during religious services only. (SAC ¶¶ 128–29). Plaintiff claims that other inmates are allowed to wear their "Jackits [sic]" throughout the facility and on outside trips, but when he requested permission to do so, he was denied. [8]

Plaintiff claims that Dr. Ali, a Muslim chaplain, denied plaintiff the right to have books on tape and "Auxiliary Aides [sic]." (SAC ¶¶ 207–208). Plaintiff also alleges that defendant Ali refused to put plaintiff on the call-out for Friday religious services in "retaliation" after defendant Ali found out that plaintiff was filing grievances against him. (SAC ¶ 210). Plaintiff also raises the religious clothing claims against this defendant. (SAC ¶¶ 225–35).

Plaintiff's last two served defendants, the State of New York and DOCCS, which plaintiff holds responsible for all his

claims, including the Ramadan meals in 2008 and 2010, the religious clothing claims, and "reasonable accommodation" claims. (SAC ¶¶ 236–303).

**\*6** Defendants have filed a substantial number of exhibits, including plaintiff's deposition, declarations by defendants and non-defendants, and decisions from a previous Northern District of New York case, brought by plaintiff in 2010. (Dkt. No. 67–2–67–26). Rather than detail all the defendants' facts at the outset, I will discuss the evidence as I analyze the issues presented by defendants' motion.

## II. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006)."Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."*Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. .,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## III. *Statute of Limitations*

### A. Legal Standards

Federal courts borrow the state law personal injury statute of limitations period for purposes of filing section 1983 actions. *Wilson v. Garcia,* 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). In New York State, the relevant limitations period is three years. *Owens v. Okure,* 488 U.S. 235, 250–51, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989).*See*N.Y. Civ. Prac. L & R. § 214(5). Thus, unless the limitations period is tolled for some reason, a plaintiff must file his section 1983 civil rights action within three years of the accrual of each cause of action. Federal law governs the question of when a section 1983 claim accrues. *Covington v. City of New York,* 171 F.3d 117, 121 (2d Cir.1999) (citing *Morse v. University of Vermont,* 973 F.2d 122, 125 (2d Cir.1992)). Generally, under federal law, a cause of action accrues when "the plaintiff knows or has reason to know of the injury which is the basis of his action."*Id.* (quoting *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980) (internal quotation marks omitted)). Although federal law determines when a section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled. *Abbas v. Dixon,* 480 F.3d 636, 641 (2d Cir.1997).

## B. Application

**\*7** Defendants argue that any claims regarding plaintiff's Ramadan meal which accrued during Ramadan 2008 are barred by the statute of limitations. This court agrees. Plaintiff claims that Ramadan was in September of 2008, during which time, he alleges that he was not allowed to obtain the "fast" breaking meal each evening. Even assuming that the last such meal occurred on September 30, 2008, plaintiff did not file this action in the Southern District of New York until March 28, 2012. (Dkt. No. 1). The three-year statute of limitations has clearly run.[9]

Plaintiff concedes that he knew his rights were being violated in 2008. However, plaintiff argues that the statute of limitations for the 2008 claims should be equitably tolled because of his dyslexia, claiming that "there [were] no policies and/or procedures in place to [e]nsure Plaintiff [was] afforded a reasonable accommodation to participate in the law library."(Dkt. No. 73–1 at 4) (alterations in original). He alleges that he has been pursuing his rights "diligently," and that DOCCS policies caused the untimeliness of his complaint. *Id.*

The doctrine of equitable tolling allows the court to extend the statute of limitations past the time of expiration as necessary to avoid inequitable circumstances. *Johnson v.*

*Nyack Hospital,* 86 F.3d 8, 12 (2d Cir.1996) (citation omitted). In order to apply equitable tolling, the court must find that "extraordinary circumstances" prevented the plaintiff from performing the required act, and that plaintiff acted "with reasonable diligence" during the period that he seeks to toll. *Walker v. Jastremski,* 430 F.3d 560, 564 (2d Cir.2005) (quoting *Doe v. Menefee,* 391 F.3d 159 (2d Cir.2004)).

Although on the surface, plaintiff's argument might have some appeal, the court notes that plaintiff brought an action in the Northern District of New York in 2010, in which he made claims regarding his ability to read and regarding his inability to properly participate in a disciplinary hearing.[10] *Keitt v. Annetts,* No. 10–CV–157 (TJM/CFH). In 10–CV–157, plaintiff made claims regarding disciplinary hearings that occurred in 2007 and in November of 2008, approximately 2 months after the Ramadan incidents that plaintiff is attempting to raise in this action. No rational fact finder could conclude that plaintiff was prevented from using the law library or from having someone assist him in 2010, when his 2008 religious food claims would have been timely. Plaintiff cannot plausibly argue that DOCCS "policies" prevented him from bringing a timely claim, and his equitable tolling argument must fail. Thus, any claims regarding his Ramadan meals from 2008 must be dismissed as time barred.

## IV. *Personal Involvement (Ramadan Meal)*

## A. Legal Standards

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 32324 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

**\*8** A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly

negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft.See Conklin v. County of Suffolk,* 859 F.Supp.2d 415, 439 (E.D.N.Y.2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon.Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.,* 811 F.Supp.2d 803, 815 (S.D.N.Y.2011)). This court finds that even if the *Colon* factors are considered, and are all still viable, plaintiff has not alleged the requisite personal involvement of the named Upstate defendants and defendant Fischer. Accordingly, no damages may be assessed against them.

## B. Application

During his deposition, plaintiff was asked why he named defendants Hawk, Lira, Uhler, Otis, Rock, and Fischer. (Pl.'s Dep. at 114–25). Plaintiff testified that he named these defendants because they were "policy makers," and they "created" the policy which excluded plaintiff from participating in his religious exercise. (*Id.*) With respect to defendant Fischer, plaintiff testified that Fischer "upheld" every CORC determination. (Pl.'s Dep. at 123). Plaintiff did not know whether defendant Fischer ever actually reviewed the appeals of his grievances, but plaintiff testified that the people Fischer appointed would "rubberstamp" defendant Fischer's signature. (*Id.* at 124). Plaintiff stated that he was not sure whether defendant Fischer ever signed a CORC determination. (*Id.*) Essentially, plaintiff conceded that he only named defendant Fischer because he was a "policy maker," without specific reference to his personal involvement in any of the alleged violations. (*Id.*)

Plaintiff's testimony describes the doctrine of respondeat superior, and therefore, he has failed to allege the personal involvement of defendants Hawk, Lira, Uhler, Otis, Rock, and Fischer. However, even if plaintiff had made the proper allegations, defendants have come forward with sworn evidence, showing that none of these defendants were, or

could have been, personally responsible for inmates' diets, religious or otherwise.

**\*9** Defendants have filed the declaration of Elizabeth Culkin,[11] the Assistant Director ("Ass't Dir.") of DOCCS Office of Nutritional Services ("ONS"). (Culkin Decl. ¶ 1) (Dkt. No. 67–12). In her declaration, Ass't Dir. Culkin states that the ONS is under the supervision of DOCCS Deputy Commissioner of Administrative Services, and ONS is responsible for providing nutritionally adequate meals for DOCCS' "approximately 54,700 inmates." (Culkin Decl. ¶ 4). Ass't Dir. Culkin states that she is responsible for providing guidance with respect to DOCCS nutrition policies and procedures, and that "absent an emergency, the correctional officials at an individual facility like Upstate ... do not have the authority to deviate from the general confinement menu without the approval of [ONS]." (Culkin Decl. ¶ 4).

Based upon Ass't Dir. Culkin's declaration, none of the Upstate defendants named by plaintiff in this case could have had any responsibility for plaintiff's diet or for changing the diet at plaintiff's request. Personal involvement requires that the individual who is, or becomes aware of, the violation, have the ability to take action to correct the problem. *See Conklin v. City of Suffolk,* 859 F.Supp.2d at 441–42 (personal involvement requires knowledge and the ability to take action). Supervisory individuals such as defendants Fischer, Lira, Hawk, Uhler, Otis, and Rock would not have the expertise to determine what meals, or how many meals, a diabetic inmate (or any inmate) should or should not eat. Defendants Rock, Uhler, Lira, Otis, and Hawk each submit a declaration affirming that the dietary decisions about which plaintiff complains are strictly governed by ONS, and none of them have any responsibility for creating or changing any inmate's diet, regardless of whether the diet is therapeutic[12] or whether the inmate is eating the food served to the general population.[13] (Rock Decl. ¶¶ 2–5; Uhler Decl. ¶¶ 2–5; Lira Decl. ¶¶ 2–5; Otis Decl. ¶¶ 2–5; Hawk Decl. ¶¶ 2–5). In addition, and as discussed further below, the DOCCS Medical Nutrition Therapy Manual specifically provides that therapeutic diets must be prescribed by an authorized health care provider, and that combinations of religious menus and therapeutic diets are not offered. (DOCCS Medical Nutrition Therapy Manual at 7, ¶ 6) (Def.s' Ex. B; Dkt. No. 67–14). Thus, the Upstate defendants and defendant Fischer had no personal involvement in plaintiff's diet, and any claim for damages may be dismissed on that basis. Plaintiff requests only damages for his religious dietary claims. Thus, all his claims relating to incidents at Upstate may be dismissed. Even

if plaintiff were asking for injunctive relief or had named someone who was actually responsible for his diet (which would have allowed him to request monetary damages), plaintiff's claims would fail on the merits.

## V. *Religion Claims*

### A. Legal Standards

### 1. First Amendment

 **\*10** Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) and *Turner v. Safely,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588.

In *O'Lone,* the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner,* 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord,* 467 F.3d 263, 274 n. 4 (2d Cir.2006) (citations omitted). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The Second Circuit has examined the standard for analyzing a First Amendment religion claim. *Holland v. Goord,* 758 F.3d 215, 220–23 (2d Cir.2014). In *Holland,* the court discussed the degree of burden required for a First Amendment claim. *Id.* at 22021. The Second Circuit has not decided whether, to state a claim under the First Amendment, the inmate must show at the onset that the disputed conduct "substantially

burdens his sincerely held religious beliefs."*Id.* at 220 (citing *Salahuddin, supra* at 274–75; *Ford, supra* at 592 (where the court assumed without deciding that the substantial burden test applies)). While the court in *Holland* did not decide the issue, it assumed the continued validity of the substantial burden test and analyzed the case accordingly. [14] *Id.* at 221. This court will follow the analysis in *Holland* and will consider the First Amendment claim, assuming that the substantial burden test is still valid.

Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett,* No. 02–CV–349, 2007 WL 1017102, at \*4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin, 467 F.3d at 274*). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiff to show that the defendants' concerns are "irrational." *Ford,* 352 F.3d at 595.

### 2. Religious Land Use and Institutionalized Persons Act
 **\*11** RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

> (A) is in furtherance of a compelling governmental interest; and

> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial. [15] *Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (citing 42 U.S.C. § 2000cc–2(b)). The burden then shifts to the government to show that the limitation furthers a compelling governmental interest *and* that it is the *least restrictive* means of achieving that interest. *Id.* The act defines "religious exercise" to include "any exercise of religion, whether or not

compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A).

## B. Application

### 1. Religious Meals

#### a. RLUIPA

As stated above, in plaintiff's second amended complaint, he asks only for damages with respect to his dietary claims. Monetary damages are not available under RLUIPA. *Sosamon v. Texas,* —— U.S. ——, 131 S.Ct. 1651, 1659, 179 L.Ed.2d 700 (2011); *Holland v. Goord,* 758 F.3d at 224. Additionally, plaintiff has been transferred out of Upstate, where the alleged violations occurred. An inmate's transfer from a prison generally moots claims for declaratory and injunctive relief against officials of that facility. *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006). Thus, to the extent plaintiff could have requested injunctive relief, that request would be moot as against the individuals at that Upstate, [16] and plaintiff's RLUIPA claim, relating to his Ramadan meals may be dismissed.

#### b. First Amendment

The Free Exercise Clause applies to an inmate's diet and participation in religious meals. *McEachin v. McGuinnis,* 357 F.3d at 204–205; *Ford,* 352 F.3d at 597. The Constitution requires that an inmate be provided, at a minimum, with nutritionally adequate meals, "but otherwise retain 'considerable discretion' over dietary decisions." *Smith v. Perlman,* No. 9:11–CV–20, 2014 WL 7333229, at *10 (N.D.N.Y. Dec. 19, 2014) [17] (quoting *Walker v. Fischer,* No. 9:10–CV–01431, 2012 WL 1029614, *6 (N.D.N.Y. Mar.26, 2012)). It has generally been found that to deny an inmate food that satisfies the dictates of his faith does unconstitutionally burden the inmate's free exercise rights." *Id* . (quoting *McEachin,* 357 F.3d at 203). However, courts are " 'reluctant to grant dietary requests when the cost is prohibitive, or the accommodation is administratively unfeasible.' " *Id.* (quoting *Benjamin,* 905 F.2d at 579 (citations omitted)).

**\*12** At the times in question, plaintiff was a practicing Muslim. [18] There is no dispute that during Ramadan, practicing Muslims are required to fast during the day. After sundown, the individuals who participate in the fast are served a special meal to break the fast. Plaintiff has been diagnosed with diabetes. Although he disputes whether he was on a specific therapeutic meal plan in 2010, [19] he states in his amended complaint that, during the time in question, he was required to take his medication with food, and thus, he was not able to fast during the day. However, he believes that in addition to his three regular meals, he was entitled to be served the special meal, given to those inmates who participated in the fast, even though he did not do so. This would involve being served a fourth meal after sunset at approximately 7:30 p.m., [20] when he had already eaten his third meal of the day at approximately 4:00 p.m. (SAC ¶ 30, Pl.'s Dep. at 92). Plaintiff alleges that defendants' refusal to allow him to participate in the Ramadan meal during the 2010 holiday violated his First Amendment rights.

As background, in her declaration, Asst. Dir. Culkin states that in addition to the state-wide menu, DOCCS has a Religious Alternative Menu ("RAM"), initiated in 1996, which was designed to accommodate the needs of inmates who may have "different dietary requirements due to their religious beliefs or personal dietary beliefs," and is available to any inmate who wants it, regardless of religious affiliation. (Culkin Decl. ¶¶ 6–8). The RAM program is served at the same time and in the same fashion as the regular menu, but provides an alternative to the meat entrees. (Culkin Decl. ¶ 8).

In order to accommodate Muslim inmates, who do not eat pork, DOCCS serves a pork entree only once per month and offers a pork alternative at that meal. (Culkin Decl. ¶ 9). In addition, once per week, the RAM provides a "halal" meat entree, which is also provided to Muslim inmates during Muslim holy feast days of Eid–ul–Fitr and Eid al-Adha, and during Ramadan. [21] (Culkin Decl. ¶ 11). Inmates are also allowed to supplement their halal meats with facility commissary purchases or care packages from home. (Culkin Decl. ¶ 13). Ass't Dir. Culkin states that to meet the dietary requirements for religious observances such as Ramadan, ONS works in conjunction with the Division of Ministerial, Family, and Volunteer Services to develop a religious holiday menu. (Culkin Decl. ¶ 17).

As stated above, the DOCCS Medical Nutrition Therapy Manual states that religious menus must be strictly followed and may not be combined with medical therapeutic diets. (Culking Decl. ¶ 19 & Def.s' Ex. B at 7). The manual also provides that in general, double portions are not considered therapeutic and are not provided. (Def.s' Ex. B at 7). Ass't Dir. Culkin states that the purpose of the special Ramadan meal, served to fasting Muslims after sundown, is to provide participating individuals with a meal to break their fast.

Allowing plaintiff to participate in this meal would essentially give him four meals, and a substantial number of extra calories, per day. [22]

**\*13** Inmates who are on therapeutic diets may choose to participate in the Ramadan morning and evening meals "if approved by Health Services personnel," and those inmates are excused from picking up their special diet meals at the regularly scheduled times. Their medical diets resume immediately after Ramadan ends. (Culkin Decl. ¶ 21). Thus, if medically appropriate, inmates may participate in the therapeutic meal or the Ramadan meals, but may not do both at the same time as plaintiff wished to do. (*Id.*) Ass't Dir. Culkin states that allowing an inmate to participate in both meal plans at the same time would "defeat the purpose of the therapeutic diet meals as well as the religious fast of Ramadan."(*Id.*) If plaintiff did not fast for Ramadan, nutritionally, there was no reason for a special meal to "break" the fast. (*Id.*) In addition, therapeutic meals for an inmate with diabetes "are designed to control carbohydrate and calorie intake."(*Id.*) Adding another evening meal would "significantly increase the total carbohydrate and calorie levels."(*Id.*)

In *Smith v. Perlman,* the court granted summary judgment for defendants on a similar, but not identical issue. The plaintiff in *Smith* was on a "Controlled A" therapeutic diet, and could not eat the RAM diet for medical reasons. Defendants in *Smith* refused to serve plaintiff a special menu combining the elements of the RAM diet with the Controlled A diet. The court found that the defendants' refusal to combine the menus was "justified by the legitimate penological concern of meeting the disparate needs of approximately 54,700 inmates in an economically feasible way."2014 WL 7333229, at \*11. The court held that there was clearly a rational relationship between the legitimate penological interest and the defendants' policy, which offers numerous menus, tailored to meet the needs of different inmates. *Id.* The defendants' refusal to permit plaintiff to incorporate RAM entrees of his choosing into his diet "also serves the legitimate purpose of maintaining the therapeutic integrity of the medical diet."*Id.* The plaintiff in *Smith* offered "no viable less restrictive means of accommodating his rights that [were] consistent with Defendants' valid penological interests."*Id.* at \*12.

Plaintiff in this case does not claim that he was unable to obtain food which met his religious dietary requirements. He does not allege in his second amended complaint that his meals were nutritionally inadequate. Instead, he claims that

he could not participate in the meal to break a fast in which he was not participating. Participation in this meal would involve plaintiff obtaining extra food which would not be consistent with his medical requirements. [23] The refusal to allow plaintiff to obtain extra food in an amount that would be medically contraindicated, particularly when he had not participated in the fast during the day, serves a legitimate penological interest and is rationally related to that interest.

**\*14** A policy which prohibits mixing different types of meal plans is also rationally related to the legitimate penological interest in the orderly and cost-effective provision of nutritional meals for a substantial number of inmates. The requirement that only certain qualified individuals be able to alter an inmate's menu is also rationally related to this legitimate interest. Plaintiff clearly placed his health above his religious observance since he did not participate in the required Ramadan fast due to his inability to take required medication without food. There is no other way that plaintiff would be able to participate in the special Ramadan meal and "maintain the integrity of the therapeutic diet."Thus, plaintiff's First Amendment claim relating to Ramadan meals may be dismissed.

## 2. Clothing/Books on Tape/Religious Services at Coxsackie

Plaintiff lists items of religious clothing (head scarf, turban, and robe) that he wished to wear all though the facility and on outside visits. Plaintiff is free to wear these items in his cell and when he attends congregate services. He is also allowed to wear his kefiya (head scarf) in the shower in order to clean it. Plaintiff testified during his deposition that he does not own a turban because it is too expensive. (Pl.'s Dep. at 70–71). Plaintiff also claims that because he is dyslexic, he is entitled to books on tape and other reading aids for his religious books. Plaintiff does request injunctive relief with respect to his clothing claims and reading aids, and therefore, plaintiff may pursue his RLUIPA cause of action with respect to this claim to the extent that it relates to DOCCS policy in general. [24] With respect to attendance at religious services, plaintiff names only Dr. Ali as responsible for failing to place plaintiff on "religious call-out," and only damages would be available for this alleged violation. Thus no RLUIPA claim is available for plaintiff's failure to attend religious services at Coxsackie.

Defendants first argue that plaintiff failed to exhaust his administrative remedies with respect to any of his clothing claims prior to bringing this action.

#### a. Exhaustion

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (exhaustion requirement applies, *inter alia,* to excessive force claims)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

**\*15** The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state procedural rules, including meeting appropriate deadlines. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion is a prerequisite to bringing suit in federal court. 548 U.S. at 90–103. In *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), the Second Circuit specifically held that completion of the administrative review process includes receiving the decision on the final appeal of a grievance *prior to* filing the federal action.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp.Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office

Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano,* it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused.[25] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

Although the Second Circuit has not explicitly held that *Hemphill* remains good law after *Woodford,* it has noted in more recent cases, that the exhaustion requirement may be excused, as have other district courts.[26] *See, e.g., Macias v. Zenk,* 495 F.3d 37 (2d Cir.2007) (using the three-part inquiry); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009) (recognizing that there may be exceptions to the exhaustion requirement); *Snyder v. Whittier,* 428 F. App'x 89, 91 (2d Cir.2011)) (using the three-part inquiry); *Carlson v. Parry,* No. 06–CV–6621, 2013 WL 5354517, at *9–10 (W.D.N.Y. Sept.24, 2013) (recognizing that the exhaustion requirement may be excused; *Morrison v. Hartman,* 898 F.Supp.2d 577, 581 (W.D.N.Y.2012) (same).

**\*16** In support of their exhaustion argument, defendants have submitted the declaration of Karen Bellamy, Director of the DOCCS Inmate Grievance Program. (Bellamy Decl.) (Dkt. No. 67–7). In her declaration, Dir. Bellamy states that plaintiff did not file any grievances regarding his clothing, reading aids (books on tape), or attendance at religious services until March 29, 2012. (Bellamy Decl. ¶¶ 3, 4 & Ex. B). The grievance was not finally decided by the CORC until August 29, 2012. (*Id.*) This action was filed in the Southern District of New York on March 28, 2012, before he even filed his grievance and long before the CORC made a final decision on his grievance.[27] The court notes that plaintiff's original

complaint contained claims regarding his religious clothing. (*See e.g.* Compl. ¶ 190—head covering).

The court also finds that none of the exceptions to the exhaustion requirement apply in this case. It is clear that the grievance procedure was available to the plaintiff, and that none of the defendants prevented him from utilizing it. Plaintiff simply did not exhaust his remedies prior to filing this action, and there are no extenuating circumstances that would excuse this defect. In his response to defendants' motion, plaintiff states that his second amended complaint was filed after the CORC decision, and that the length of time it took to get a CORC response should excuse the exhaustion requirement. (Dkt. No. 73–1, ¶¶ 28–29). However, plaintiff filed this action the day before he filed his first grievance regarding the Coxsackie claims. At that time, he would not have known how long it would take the CORC to decide his claims or even whether he would have to appeal all the way to the CORC. [28] Plaintiff could have been successful with his grievance and would not have been required to appeal. The fact that plaintiff filed his second amended complaint after the CORC finally denied his claims does not change this court's analysis. Plaintiff included those issues in his original complaint, and there was no excuse for failing to exhaust prior to bringing his initial filing. Subsequent exhaustion after suit is filed is insufficient to satisfy the PLRA requirment. *See Lee v. O'Harer,* No. 9:13–CV–1022, 2014 WL 7343997, at *6 (N.D.N.Y. Dec.23, 2014) (citing *Neal, supra* ); *Fuentes v. Furco,* No. 13–CV–6846, 2014 WL 4792110, at *2 (S.D.N.Y. Sept.25, 2014) (citing *Neal, supra;* *Couvertier v. Jackson,* No. 9:12–CV–1282 (DNH/DEP), 2014 WL 2781011, at *4 (N.D.N.Y. June 19, 2014) (adopting Rep't–Rec.) (citations omitted). Thus, plaintiff failed to exhaust his administrative remedies prior to filing this action, and all his claims relating to Coxsackie may be dismissed for failure to exhaust administrative remedies.

**b. Merits**

Even if plaintiff had exhausted his administrative remedies before filing this action, the court would recommend dismissing plaintiff's claims. Plaintiff claims that he should be able to wear a turban or kefiya, and his Jâlâbiyah robe throughout the facility and on outside trips. Plaintiff claims that the Sikhs are allowed to wear their turbans and other inmates are allowed to wear their jackets, throughout the facility. First, the court would point out that plaintiff does not, and has never owned a turban. (Pl .'s Dep. at 67). Plaintiff testified that he has a kefiya, and that a turban

is "similar." (*Id.* 65–66). Plaintiff also stated that "another inmate" told plaintiff that he was supposed to wear his head covering at all times, but he did not remember who that inmate was and whether the inmate had any religious training. (*Id* . at 62–63). Plaintiff also testified that, although he can wear his kefiya in his cell, he does not wear it all the time, and in fact, only wears it approximately 65 percent of the time. (*Id.* at 64). Sometimes he forgets to wear it, and he does not wear it when it is dirty. (*Id.* at 63). Plaintiff's robe is white and is knee length. (*Id.* at 112). Plaintiff testified that he does not wear the robe in his cell because he does not want the robe to get dirty, but he is allowed to, and does wear it, to services, because it is "dress-up" for going to church. [29] (*Id.*) Plaintiff also testified that he is allowed to wear the kefiya in the shower to clean it. (*Id.* at 55–56, 64).

**\*17** By his own testimony, plaintiff does not wear his kefiya or his robe at all times even when he is allowed to do so. Thus, it is questionable that any policy that restricts plaintiff's use of these items to his cell, religious services, and in the shower (for his kefiya) substantially burdens the exercise of plaintiff's religion because it is questionable that plaintiff sincerely believes that he must wear these items "all the time." In any event, the court notes that DOCCS Directive No. 4202 was amended in July of 2014. The revised directive permits any male inmate, belonging to any faith group, to wear the type of turban that had previously been permitted only for Sikh males, apparently without limitation on the location. [30] *See Rossi v. Fischer,* No. 13–CV–3167, 2014 WL 5778702, at *4, 6 (S.D.N.Y. Sept.11, 2014)* (discussing the provisions contained in the revised directive). Thus, plaintiff's request for injunctive relief with respect to his head covering is moot.

The court also notes that although plaintiff claims that he is dyslexic, there is absolutely no showing that he cannot read or that he would need books on tape for religious studies. In plaintiff's previous case in the Northern District of New York, Magistrate Judge Hummel recommended dismissing an ADA claim because plaintiff's 2006 test scores from the Test of Adult Basic Education ("TABE") showed that plaintiff had an 8.7 grade reading level, indicating that he could read proficiently. *Keitt v. Annetts,* No. 9:10–CV–157, at 4, 13 (N.D.N.Y. Dec. 3, 2012) (Def.s' Ex. B). Magistrate Judge Hummel concluded that a rational fact-finder would not find that plaintiff had an impairment that substantially limited a major life activity. *Id.* Senior Judge McAvoy adopted the recommendation, and the Second Circuit dismissed plaintiff's appeal as frivolous. *Keitt v. Annetts,* No. 13–972 (2d Cir. Aug. 7, 2013).

Defendants ask this court to find that the dismissal of plaintiff's 2010 claim based upon dyslexia collaterally estops plaintiff from claiming in this action that defendants violated his religious rights and his rights under the ADA or the Rehabilitation Act when they refused to "reasonably accommodate" plaintiff's dyslexia by giving him religious books on tape or other reading aids .[31] Plaintiff argues that the defendants' "serious misconduct" should prevent them from asserting collateral estoppel.[32] (Dkt. No. 73–2 at ¶ 29). Plaintiff claims that he did not have a "full and fair opportunity to litigate because he was denied "documentary evidence concerning his dyslexic report."(*Id.* ¶ 30).

Res judicata includes two concepts: claim preclusion and issue preclusion, also known as collateral estoppel. *Rivera v. City of New York,* —— F. App'x ——, 2014 WL 5463320, at *2 (2d Cir. Oct.29, 2014). Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. The doctrine bars subsequent litigation if the earlier decision was (1) a final judgment on the merits, (2) the previous action involved the plaintiff or those in privity with him, and (3) the claims asserted in the subsequent action were, or could have been raised in the prior action. *Id.* (quoting *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 285 (2d Cir.2000)).*See also Ajamian v. Nimeh,* No. 1:14–CV–320, 2014 WL 6078425, at *2 (N.D.N.Y. Nov. 13, 2014) (citing *EDP Med. Computer Sys., Inc. v. United States,* 480 F.3d 621, 624 (2d Cir.2007) (internal citations and quotation omitted)). Under claim preclusion, even if the plaintiff's claims are based upon different legal theories, they are barred in the subsequent action, provided they arise from the same transaction or occurrence. *Id.* (citing *LTec Elecs. Corp. v. Cougar Elec. Org., Inc.,* 198 F.3d 85, 88 (2d Cir.1999) (per curiam)).

**\*18** The doctrine of collateral estoppel provides that once a court has actually and necessarily decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue on a different cause of action involving a party to the first case. *Rivera v. United States,* No. 3:10–CV–1970, 2012 WL 3043110, at *2 n. 5 (D.Conn.2012) (discussing collateral estoppel) (citations omitted). Collateral estoppel is applicable if (1) the issues in both proceedings are identical; (2) the issue of law or fact was "actually litigated and actually decided" in the prior proceeding; (3) the party against whom preclusion is sought had a full and fair

opportunity for litigation in the prior proceeding; and (4) the previously litigated issues were necessary to support a valid and final judgment on the merits. *Ali v. Mukasey,* 529 F.3d 478, 489 (2d Cir.2008) (citing *Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 (2d Cir.1986)); *Wade v. City of Kingston,* No. 1:13–CV–623, 2014 WL 4897244, at *4 (N.D.N.Y. Sept. 30, 2014) (citing *Davis v. Halpern,* 813 F.2d 37, 39 (2d Cir.1987) (citation omitted)).*See also NML Capital, Ltd. v. Banco Central de la Republica Argentina,* 652 F.3d 172, 184–85 (2d Cir.2011) (discussing factors considered for collateral estoppel). Whether a previous federal court judgment has preclusive effect in a subsequent action is a question of federal common law. *NML Capital, Ltd.,* 652 F.3d at 184 (citing *Taylor v. Sturgell,* 553 U.S. 880, 891, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008)).

The issue of plaintiff's dyslexia was finally litigated in plaintiff's 2010 action. Although plaintiff claims that he did not have a full and fair opportunity to litigate the issue, even a cursory reading of Magistrate Judge Hummel's Report–Recommendation refutes this allegation. Magistrate Judge Hummel reviewed plaintiff's pre-incarceration educational records, produced by plaintiff himself. (Def.s' Ex. B at 3–4). When plaintiff was deposed in that action, he stated that he was dyslexic, not illiterate, and that he could read bold print. (*Id.* at 4). A non-party, director of education for DOCCS reviewed plaintiff's records, and found that nothing in those records indicated that plaintiff was dyslexic. (*Id.*)

In recommending that the court grant defendants' motion for summary judgment, Magistrate Judge Hummel found that plaintiff was not a qualified individual with a disability. Although reading is considered a major life activity, plaintiff had failed to establish that his alleged impairments "limit his ability to hear, read, think, or communicate in a substantial manner."(*Id.* at 12). Because plaintiff failed to establish the first prong of an ADA claim, the claim was dismissed. This issue was central to plaintiff's ADA claim, and there is no indication that plaintiff was prevented from litigating his claim. Thus, plaintiff cannot base another ADA claim on his alleged dyslexia. In any event, plaintiff was not prohibited from obtaining his own books on tape and was not prevented from attending religious worship because of his impairment.

**\*19** Additionally, defendants have submitted defendant Ali's declaration, indicating that plaintiff arrived at Coxsackie on March 13, 2012, and that he was transferred out of that facility on July 9, 2013. (Ali Decl. ¶ 3). Defendant Ali alleges that approximately two weeks after plaintiff's arrival

at Coxsackie, he filed a grievance against Dr. Ali, alleging that he failed to provide plaintiff with books on tape and failed to place him on call-out for religious services. (Ali Decl. ¶ 4 & Ex. B). Dr. Ali claims that prior to April 12, 2013, plaintiff never requested such attendance. (Ali Decl. ¶ 4 & Ex. C). With respect to the books-on-tape and "auxiliary" aids, Dr. Ali states that he never had any involvement in making decisions with respect to plaintiff's requests. (Ali Decl. ¶ 5). Dr. Ali has attached the "reasonable accommodation" paperwork that was handled by other individuals. (Ali Decl. ¶ 6). Thus, Dr. Ali had no personal involvement in denying plaintiff his desired "reasonable accommodations," and any claim for damages against defendant Ali would be subject to dismissal for lack of personal involvement.

## VI. *Miscellaneous Statutes and Claims*

Plaintiff has listed a variety of statutes upon which he bases his claims. The court notes that lack of personal involvement is also fatal to a claim under 42 U.S.C. §§ 1981 [33] and 1985. [34] *See Kantrowitz v. Uniondale Union Free School Dist.,* No. 08–CV–3592, 2011 WL 4593147, at *17 (E.D.N.Y. Sept. 30, 2011) (discussing both section 1983 and 1981) (citing *inter alia Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987)); *Keitt v. New York City,* No. 09 Civ. 8508, 2011 WL 4526147, at *3 (S.D.N.Y. Sept.29, 2011) (the personal involvement requirement also applies to conspiracy claims under section 1985). Thus, any claims under sections 1981 and 1985 may be dismissed. [35] In addition a claim under 42 U.S.C. § 1986 for failure to prevent the violation of a person's civil rights may not exist absent a viable section 1985 claim. *See Todd v. Brookhaven Nat. Lab.,* 407 F.Supp.2d 404, 415 (E.D.N.Y.2006). Accordingly, any claims plaintiff may have based upon section 1986 may also be dismissed.

Plaintiff also cites 42 U.S.C. § 1988 as a "basis" for his claims. Section 1988 provides for the applicability of certain laws and provides for attorneys fees for prevailing parties in the enforcement of other sections of the civil rights laws, but is not a separate basis for jurisdiction. 42 U.S.C. § 1988(a)-(c). *See Reid v. Toyota Motor Credit Corp.,* No. 12 Civ. 7436, 2013 WL 3776201, at *2 (S.D.N.Y. July 18, 2013).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 67) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY,** and it is

**RECOMMENDED,** that plaintiff's cross-motion for summary judgment (Dkt. No. 73) be **DENIED.**

**\*20** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed Jan. 8, 2015.

**All Citations**

Slip Copy, 2015 WL 1246058

## Footnotes

1    *See* 42 U.S.C. §§ 2000cc–2000cc–5.
2    *See* 42 U.S.C. §§ 12101–12213.
3    *See* 29 U.S.C. §§ 701–796*l*.
4    Additionally, despite the fact that these claims could be dismissed for lack of personal involvement, Judge Baxter went on to explain that these claims should also be dismissed on the merits. (Dkt. No. 79 at 15–25.)
5    Keitt's renewed motion to appoint counsel is denied.
1    The original complaint was signed on March 25, 2012. (Compl.¶ 208).
2    Plaintiff also filed a first amended complaint prior to the transfer to this district. (Dkt. No. 31). The second amended complaint is the operative pleading herein, and the court will refer to that document unless otherwise noted.
3    Ada Perez is the Superintendent at Downstate Correctional Facility.
4    E. Killar appears to be the Inmate Grievance Program ("IGP") Supervisor at Coxsackie. (Dkt. No. 59–1 at CM/ECF p. 14).

5    Defense counsel notes that these defendants have not been served, and thus, counsel does not represent them. Because the complaint may be dismissed on other bases as discussed below, and plaintiff has made no allegations against some of the non-served defendants, the court finds that notwithstanding the failure to serve, the complaint may be dismissed as against all these defendants.

6    Defendant Fischer is no longer the Commissioner of DOCCS. Anthony J. Annucci is currently the Acting Commissioner, appointed by Governor Cuomo on May 1, 2013. *See* www.doccs.ny.gov/Annucibio.htm

7    Plaintiff originally named Lucian LeClaire, another Deputy Commissioner, but this defendant was dropped from plaintiff's second amended complaint.

8    All of plaintiff's religious clothing and "books on tape" claims relate to incidents that occurred at Coxsackie. Plaintiff's claims against non-served defendant Bellnier track the language of the claims against defendant Fischer with respect to the religious head covering and robe. (SAC ¶¶ 137–49). Plaintiff's claims against non-served defendant Coxsackie Superintendent D. Martuscello relate to excluding plaintiff from participating in Ramadan religious class in 2012 "because of his disability," by failing to provide him with Auxiliary Aids and books on tape, after being told by plaintiff that he was dyslexic and could not read or write without "reasonable accommodation." (SAC ¶ 153–54). Plaintiff also claims that the reasons for denying him these items were related to "the color of his skin and the texture of his hair."(SAC ¶ 158). Plaintiff repeats his clothing claims against defendant Martuscello. (SAC ¶¶ 162–71). With respect to non-served defendant P. Melecio, the Deputy Superintendent of Programs at Coxsackie, plaintiff claims that he repeatedly requested "reasonable accommodations," but that defendant Melicio responded to a grievance on April 19, 2012, stating that Dyslexia was not a medical condition that required reasonable accommodation pursuant to DOCCS Directive No. 2614. (SAC ¶ 175). Plaintiff also claims that this defendant retaliated against him after he found out that plaintiff was filing grievances against him by "deliberately blocking his access to religious services" by refusing to add his name to the authorization list that he provides to the general population. (SAC ¶ 177). Plaintiff was excluded from all services because his name was not on the call out for services. (SAC ¶ 182). With respect to defendant C. Miller, a Coxsackie "employee" plaintiff repeats the religious clothing claims and alleges that defendant Miller also carried out a "threat" based on plaintiff filing a lawsuit. (SAC ¶ 200).

9    This is true even if the court uses March 25, 2012 (the date plaintiff signed his original complaint) as the date of filing. The Supreme Court has held that an inmate's papers may be deemed "filed" at the moment of delivery to prison authorities for forwarding to the district court.*Houston v. Lack,* 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988). This rule became known as the "prison mailbox rule," and has been applied to inmates filing complaints for purposes of the statute of limitations. *See Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), modified on other grounds, 25 F.3d 81 (2d Cir.1994).

10    The court notes that plaintiff's alleged dyslexia was discussed at length in Magistrate Judge Christian Hummel's Order and Report–Recommendation which recommended granting the defendants' motion for summary judgment as to plaintiff's ADA and Fourteenth Amendment claims and dismissing plaintiff's action "with prejudice." (Dkt. No. 98, 10–CV–157 at 3– 5). Senior District Judge Thomas McAvoy adopted Magistrate Judge Hummel's recommendation on February 15, 2013, and the Second Circuit dismissed plaintiff's appeal from Senior Judge McAvoy's decision because "it lacks an arguable basis in law or in fact. *See*28 U.S.C. § 1915(e); *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989)." (Dkt. Nos. 102 and 110 in 10–CV–157). Defendants have included copies of all three court decisions as exhibits to their motion in this case. (Dkt. No. 67–4 67–6).

11    Assistant Director Culkin is not a defendant in this action.

12    In his response to the defendants' motion for summary judgment, plaintiff claims that although he is diabetic, and he was on a "therapeutic" diet in 2008, he was no longer on a "calorie controlled diet" in 2010. (Dkt. No. 73–1, ¶ 11, Pl.'s Dep. at 92). Ass't Dir. Culkin assumes in her affidavit that plaintiff was on a "controlled therapeutic menu for inmates." (Culkin Decl. ¶ 18). The court notes that its analysis of personal responsibility and the following analysis of plaintiff's First Amendment claim would be the same whether or not plaintiff was on a therapeutic diet in 2010.

13    Even though defendant Fischer has not submitted a declaration, it is clear that as the former Commissioner, who was not even at Upstate, he would not have been responsible for plaintiff's dietary requirements or requests.

14    This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal. *Holland,* 758 F.3d at 221.

15    RLUIPA uses the term "substantial burden" in the language of the statute, removing any ambiguity with respect to the extent of the burden required to establish a statutory claim.

16    In *Blalock v. Jacobsen,* No. 13–CV–8332, 2014 WL 5324326, at *3 & n. 2 (S.D.N.Y. Oct.20, 2014), the court discussed the possibility that RLUIPA claims for injunctive relief might not be moot upon an inmate's transfer if the "Commissioner's" policy continued to burden and adversely affect the plaintiff's rights, under the theory that the violation is capable of

repetition, yet evades review. *Id.* (citing *Pugh v. Goord,* 571 F.Supp.2d 477, 507 (S.D.N.Y.2008)). As stated above, plaintiff does *not ask* for injunctive relief as to his dietary claims as he does with respect to his religious clothing claims. Plaintiff clearly knows the difference between asking for one type of relief or another. Thus the court's recommendation of dismissal is based substantially on the fact that plaintiff has not requested injunctive relief. Finally, defendant Fischer is no longer the Commissioner of DOCCS, and thus, would not be subject to the request for injunctive relief in any event.

17    The defendants cite Magistrate Judge Christian Hummel's Report–Recommendation in *Smith v. Perlman.*However, the court notes that District Judge Mae A. D'Agostino has issued a very recent decision in that case, granting reconsideration of her March 14, 2014 order which was decided without objections. Judge D'Agostino accepted plaintiff's late objections, granted reconsideration, but still concluded that defendants were entitled to summary judgment dismissing plaintiff's complaint. 2014 WL 7333229 at *17. Thus, the court will cite to Judge D'Agostino's recent decision in this matter.

18    The court notes that during his deposition, plaintiff testified that in 2009, he changed his religion to Jewish so that he could receive the Jewish meals which were "hermetically sealed." (Pl.'s Dep. at 94). Plaintiff testified that he did this because he was the subject of "retaliation" by officers spitting in his food, and thus, he changed his religion to Jewish so that this could not happen. (*Id.* at 9596). He changed his religion back to Muslim when he got "out of the Upstate box." (*Id.* at 98). Plaintiff's Inmate Transfer History indicates that he was transferred from Upstate SHU to Elmira General Population on September 8, 2009, where he stayed until July 29, 2010. (Ali Decl. Ex. A) (Dkt. No. 67–16). On July 29, 2010, he was transferred back to Upstate SHU due to "Unsuitable Behavior," and he stayed at Upstate until October 5, 2010, when he was transferred to Attica. (*Id.*) Although plaintiff testified that he returned to Upstate in 2011 (Pl.'s Dep. at 100), that is not correct. Plaintiff's transfer history indicates that he never went back to Upstate after October 5, 2010. (Ali Decl. Ex. A). Although plaintiff's testimony about when he was at Upstate was confusing, the court finds that he was at Upstate during Ramadan of 2010.

19    Although plaintiff made this statement at his deposition, the court notes that in is original complaint, he submitted the Superintendent's response to his grievance, asserting inter alia, that he was denied his Ramadan meal. (Complaint "Compl." at CM/ECF p. 45). In pertinent part, the Superintendent's response reads: "Grievant was advised that he cannot receive both *special diet meals* and Ramadan meals as he requests."(*Id.*) (emphasis added). It appears from this grievance that plaintiff was, in fact, on a special diet during Ramadan 2010. The court finds that regardless of whether plaintiff was on a specific special diet, the analysis of his constitutional and statutory claims remains the same.

20    Plaintiff's response to defendants' motion contains an exhibit entitled "Ramadan–2012." (Dkt. No. 73–1 at 18). This exhibit is a memorandum from the Superintendent at Green Haven, dated July 9, 2012 and would not have been applicable to plaintiff's case. However, attached to plaintiff's original complaint is a Memorandum from defendants Hawk, Lira, Uhler, and Otis, dated July 30, 2010, which outlines the procedures for the Ramadan Fast 2010. (Compl. at CM/ECF p. 46). This memorandum states that the fast participants will gather in the Mosque and Transitional Services room at 7:30 p.m. and pray. (*Id.*) At sunset the inmates break the fast with dates that they saved from the previous night, and after the Maghrib Prayer, the inmates would go to the Mess hall and eat their Ramadan meals. (*Id.*) This memorandum applies only to CADRE inmates. Plaintiff, like most of the inmates at Upstate, was in SHU and would not have been allowed to attend congregate services in any event. However, there are inmates at Upstate in the CADRE program, who are the only general population inmates at Upstate and who are responsible for cleaning the buildings and grounds keeping. *See Weathers v. Rock,* No. 9:12–CV–1301, 2014 WL 4810309, at *2 (N.D.N.Y. Sept.23, 2014), approving Rep't Rec. dated August 6, 2014) (NAM/ATB). The memorandum attached by plaintiff would not have applied to him relative to any congregate services, and I cite this memorandum only for the statement that the Ramadan meal would be served after sunset at 7:30 p.m. as plaintiff alleges in his papers.

21    Asst. Dir. Culkin also describes the Cold Alternative Diet ("CAD") that is available to Jewish inmates and is DOCCS' kosher menu. (Culkin Decl. ¶ 14).

22    During his deposition, for the first time, plaintiff tried to claim that his regular meals at Upstate were deficient in calories, and thus, having the fourth meal would not have increased his calorie intake substantially. (Pl.'s Dep. 121–23, 138). Plaintiff testified that this calorie restriction was a form of "torture" used at Upstate. (*Id.* at 121). Plaintiff did not mention this allegation in his second amended complaint, and thus, the court does not consider this random statement as part of plaintiff's case.

23    Whether plaintiff was on a therapeutic diet or not, he was still a diabetic and taking medication for his condition. As a diabetic, he presumably should have been watching his caloric and nutritional intake. The court notes that as part of plaintiff's mandatory disclosures, he has submitted the appeal of a 2009 grievance which refers to the Ramadan fast (even though he is not claiming a 2009 violation because he listed himself as Jewish that year). (Dkt. No. 59–1 at 15). The grievance appeal specifically states that participation in the Ramadan fast was not recommended for plaintiff, and that he

could not receive both Ramadan meals and regular meals. The appeal decision further stated that in the future, plaintiff could either fast and receive the Ramadan meals "which could increase his blood sugar levels, or receive the regular meals recommended to assist in maintaining his blood sugar stability."(*Id.*) Thus, the choice was up to the plaintiff.

**24**  Plaintiff's remaining claims all relate to incidents that occurred at Coxsackie. Plaintiff is asking for injunctive relief and damages with respect to these claims. However, the only individuals who have been served relative to these claims are defendant Fischer and Ali. For the same reasons as stated above, defendant Fischer was not personally responsible for any of the issues that arose at Coxsackie, and thus, no damages could be assessed against him. Because he is no longer the Commissioner of DOCCS, to the extent that he could have provided plaintiff with injunctive relief, that is no longer possible, and the entire complaint must be dismissed as against defendant Fischer. Dr. Ali is also not in a position to afford plaintiff injunctive relief, but plaintiff has named DOCCS for purposes of RLUIPA. Dr. Ali is sued individually for his alleged failure to place plaintiff on call-out for religious services.

**25**  *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

**26**  This court also notes that, based upon the concurring opinion in *Woodford,* it appears that the Second Circuit decisions have *not* been overruled in that respect. In his concurring opinion in *Woodford,* Justice Breyer specifically noted that two circuits, the *Second* Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford* ] have concluded that the PLRA's proper exhaustion requirement is not absolute."*Woodford,* 548 U.S. at 104 (citing *Spruill v. Gillis,* 372 F.3d 218, 232 (3d Cir.2004); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)) (Breyer, J. concurring). Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a *traditional exception that the statute implicitly incorporates.*" *Id.* (emphasis added). This statement implies that there are still exceptions that a court may consider.

**27**  Director Bellamy states that plaintiff filed other grievances related to his religious clothing claims at Coxsackie, but these grievances were not filed until August 20, 2012. (Bellamy Decl. ¶ 5 & Ex. C) (Dkt.Nos.67–7, 67–10). The grievances were not decided by the CORC until January 16, 2013 and March 16, 2013. (Bellamy Decl. ¶ 5 & Exs. C, D) (Dkt.Nos.67–7, 67–10, 67–11).

**28**  Plaintiff cites a case in which the court held that a lengthy delay in handling plaintiff's initial grievance "falls within the realm of one ignored by prison authorities...."*See DeJesus v. Williams,* No. 06–209, 2007 WL 1201599, at \*3 (D.Del. Apr.23, 2007). In *DeJesus,* the court found that plaintiff filed his first medical grievance in October of 2005, and that the grievance report was not even received by the medical unit seven months later in April of 2006, and after he had filed his federal complaint. *Id.* In this case, plaintiff filed his complaint the day *before* he filed his first grievance, and thus, the defendants could not be accused of "ignoring" his grievance. The facts in *DeJesus* are clearly not applicable to this case. The same is true for the second case cited by plaintiff. *See Jones v. Detella,* 12 F.Supp.2d 824, 826 (N.D.Ill.1998). In *Jones,* the court held that plaintiff filed his federal complaint more than nine months after the relevant hearing on his grievance and after contacting the Board twice after failing to receive a response within the appropriate time frame under Illinois rules. *Id.* The court held that plaintiff had sufficiently raised an excuse for the exhaustion requirement to survive a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), which assumes as true the facts stated in the complaint. *Jones* does not help plaintiff in this case.

**29**  Plaintiff also testified that he never wore his robe while he was at Upstate. (Pl.'s Dep. at 109).

**30**  The court makes the assumption that the DOCCS policy was revised based upon *Singh v. Goord,* 520 F.Supp.2d 487, 502 (S.D.N.Y.2007). The revised directive discussed in *Singh* states that "Inmates are permitted to wear religious head-coverings as permissible in a correctional setting and outlined in the Religious Calendar."DOCCS Directive No. 4202(XIII) (Religous Headcoverings). This section further states that a facility Chaplain is to determine whether the head-covering is legitimate and whether it is being worn appropriately as noted and approved in the directive and the Religious Calendar. *Id.* No. 4202 (XIII) (A). The religious articles approved for bringing into DOCCS facilities are listed in DOCCS Directive No. 4911(J). Various items of religious clothing, including cloth turban headcoverings are described, without limitation on what religion may wear them. Directive No. 4911(J) (e) refers to a cloth "turban" head cover. An inmate may posses two outer turbans no larger than $66''$ by $36''$ and may possess up to three cloth under turbans no larger than $66''$ by $66''$

of various colors, except solid black, blue, grey, or orange. This turban sounds very similar to the head covering that plaintiff wishes to wear. Plaintiff's response to defendants' motion for summary judgment states that the kefiya may be "52 x 52 to 72 x 72 inches."(Dkt. No. 73–2, ¶ 28).

31    The court does note that Judge Hummel found that plaintiff's subsequent TABE test showed a fifth grade reading level, but a test that was taken near the filing of plaintiff's 2010 federal action showed that he had no reading ability. (Def.s' Ex. B at 4). Plaintiff claimed that he cheated on the first two tests by having another inmate take his tests. However, the evidence showed that such a thing was impossible since an inmate identification card was required to sit for the test, and the proctors were the very teachers who knew the plaintiff. (*Id.* at 5). The implication is that plaintiff purposefully scored low on the test in order to substantiate his claim.

32    As stated above, the only remaining individual defendant from Coxsackie is Dr. Ali.

33    Section 1981 provides in relevant part, that all persons within the jurisdiction of the United States shall have equal rights to make and enforce contracts, to sue and be sued, to give evidence, and to the full benefit of all laws and proceedings for the security of persons and property as enjoyed by white citizens. 42 U.S.C. § 1981(a).

34    To establish a claim under section 1985(3), plaintiff must establish a racial or class-based conspiracy to deprive a person or class of persons of equal protection of the laws. *Id.* Plaintiff must also establish an act done in furtherance of the conspiracy, and he must establish that he was injured in his person or property as a result. *Id.* Plaintiff's allegations of "conspiracy" are completely conclusory. Conclusory allegations, lacking any factual foundation, are insufficient to support a claimed conspiracy to violate another's civil rights. *See, e.g., Jackson v. County of Rockland,* 450 F. App'x 15, 19 (2d Cir.2011) (citing *Gallop v. Cheney,* 642 F.3d 364, 369 (2d Cir.2011) (finding allegations of conspiracy "baseless" where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators")); *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002).

35    It has also been noted in another case filed by this plaintiff in the Western District of New York, that it is questionable whether a section 1981 claim is viable against a state actor when the plaintiff also raises a section 1983 claim. *See Keitt v. Schun,* No. 11–CV–438, 2014 WL 347053, at *3 n. 7 (W.D.N.Y. Jan.30, 2014). When a plaintiff alleges section 1981 and section 1983 for the same conduct, the court may dismiss the section 1981 claim or deem it merged with the section 1983 claim. *Id.* (citing *Wynder v. McMahon,* No. 99 Civ. 772, 2013 WL 1759968, at *5 (E.D.N.Y. Apr. 24, 2013)).

---

2012 WL 4461647
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Angel MALDONADO, Plaintiff,

v.

Brian FISCHER, Commissioner New York State
Department of Correctional Services, Andrea
Evans, Chairwoman CEO New York State Division
of Parole, and Grant Scriven, Bureau Chief,
New York State Division of Parole, Defendants.

No. 11–CV–1091Sr.   |   Sept. 24, 2012.

**Attorneys and Law Firms**

Angel Maldonado, Alden, NY, pro se.

**ORDER**

JOHN T. CURTIN, District Judge.

### INTRODUCTION

**\*1** Plaintiff, Angel Maldonado, has commenced this action
*pro se* (Docket No. 1), and has moved for permission
to proceed *in forma pauperis,* and has filed a Signed
Authorization (Docket No. 2). Subsequent to filing the
complaint, plaintiff filed motions for preliminary injunctive
relief (Docket No. 3), and for the appointment of counsel
(Docket No.4). The Court grants the Plaintiff leave to proceed
as a poor person and, for the reasons set forth below,
determines that several of the claims set forth in the complaint
must be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)
(B) and 1915A, and that his applications for preliminary
injunctive relief and for the appointment of counsel must be
denied.

### STANDARD OF REVIEW

Section 1915(e) (2)(B) of 28 U.S.C. provides that the Court
shall dismiss a case in which *in forma pauperis* status has been
granted if the Court determines that the action (i) is frivolous
or malicious; (ii) fails to state a claim upon which relief may
be granted; or (iii) seeks monetary relief against a defendant

who is immune from such relief. In addition, 28 U.S.C. §
1915A(a) requires the Court to conduct an initial screening
of "a complaint in a civil action in which a prisoner seeks
redress from a governmental entity or officer or employee of
a governmental entity,"*id.,* regardless of whether or not the
inmate has sought *in forma pauperis* status under 28 U.S.C.
§ 1915. of the factual

In evaluating the complaint, the Court must accept as true all
allegations and must draw all inferences in plaintiffs favor.
See *Larkin v. Savage,* 318 F.3d 138, 139 (2d Cir.2003) (per
curiam); *King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999).
"Specific facts are not necessary," and the plaintiff "need
only 'give the defendant fair notice of what the ... claim is
and the grounds upon which it rests.'"*Erickson v. Pardus,*
551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)
(quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555,
127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation
marks and citation omitted); see also *Boykin v. Keycorp,* 521
F.3d 202, 213 (2d Cir.2008) (discussing pleading standard
in *pro se* cases after *Twombly* )."A document filed *pro se*
is to be liberally construed, ..., and a *pro se* complaint,
however inartfully pleaded, must be held to less stringent
standards than formal pleadings drafted by lawyers."*Erikson,*
551 U.S. at 94 (internal quotation marks and citations
omitted). Generally, the Court will afford a *pro se* plaintiff
an opportunity to amend or to be heard prior to dismissal
" 'unless the court can rule out any possibility, however
unlikely it might be, that an amended complaint would
succeed in stating a claim.'" *Abbas,* 480 F.3d at 639 (quoting
*Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d
Cir.1999) (per curiam)).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983. "To
state a valid claim under 42 U.S.C. § 1983, the plaintiff must
allege that the challenged conduct (1) was attributable to a
person acting under color of state law, and (2) deprived the
plaintiff of a right, privilege, or immunity secured by the
Constitution or laws of the United States."*Whalen v. County
of Fulton,* 126 F.3d 400, 405 (2d. Cir.1997) (citing *Eagleston
v. Guido,* 41 F.3d 865, 875–76 (2d Cir.1994)).

### PLAINTIFF'S ALLEGATIONS

**\*2** Plaintiff's claims against the defendants-the
Commissioner of the New York State Department of
Corrections and two officials of the Division of Parolestem
from the conditions of parole from a New York State

conviction, which was granted in May, 2009. Plaintiff states that he is on parole from 2003 convictions for fraud, grand larceny, petit larceny, compounding a crime, harassment, tampering with physical evidence, bribing a witness and criminal impersonation. Plaintiff alleges that upon his release on parole he was given a series of special conditions that are given to sex offenders, conditions which were renewed after plaintiff's subsequent release from prison following incarceration for parole violations in February and September, 2010, despite the fact that none of his 2003 convictions constituted or related to a sex offense. Plaintiff states that what he refers to as the "sex offender conditions" of his parole ((Docket No. 1, p. 8, ¶ 7) were imposed on him because of a prior 1997 conviction for sexual misconduct, pursuant to § 130.20(2) of the New York State Penal Law, for which he was sentenced to three years probation in March 1997 and from which he was discharged in March, 1999. He further alleges that it was never recommended nor ordered by the Court at the time of his 1997 sentencing on the sexual misconduct conviction that he attend sex offender counseling or that he register under the state Sex Offender Registration Act (SORA), N.Y. Corr. Law § 168 *et seq.* He states that at the time of his 1997 conviction, the definition of "sex offense" found in SORA did not include the offense of sexual misconduct under N.Y. Penal Law § 130.20(2). However, in 2002, § 168–a of the Correction Law was amended to include sexual misconduct under N.Y. Penal Law § 130.20(2), thereby making anyone convicted of sexual misconduct susceptible to being labeled a sex offender and thereby subjected to SORA. Plaintiff therefore alleges that fourteen years after his conviction for sexual misconduct, the Division of Parole determined that he should be "labeled a sex offender based on the definition pursuant to Correction Law § 168–a and therefore [be supervised] as a sex offender case."(Docket No. 1, p. 9, ¶ 10).

It is not clear whether plaintiff is alleging that all of the "sex offender conditions" of parole were attributable to his having been determined to be a sex offender within the meaning of SORA, or whether some of the conditions to which he objects were attached to his parole as ordinary conditions of parole to be applied by the Division of Parole at its discretion.

Plaintiff argues that the retroactive reclassification of his 1997 sexual misconduct conviction as a sex offense, and the corresponding imposition of sex offender conditions to his parole on his 2003 conviction (1) violates the Ex Post Facto Clause of the Constitution, U.S. Const. art. I, § 9, cl. 3, (2) deprives him of due process under the

Fourteenth Amendment, and (3) constitutes cruel and unusual punishment within the meaning of the Eighth Amendment. Plaintiff's complaint seeks injunctive relief, *i.e.,* that the Court direct that all sex offender conditions be removed from the conditions of his parole. Each of the three bases asserted by plaintiff will be treated as a separate claim below.

## DISCUSSION

**\*3** Parole is an "established variation on imprisonment of convicted criminals,"*Morrissey v. Brewer,* 408 U.S. 471, 477, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), which is part of a " 'continuum' of state-imposed punishments." *Samson v. California,* 547 U.S. 843, 850, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006) (citing *United States v. Knights,* 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001))."[T]he practice of releasing prisoners on parole before the end of their sentences has become an integral part of the penological system."*Morrissey,* 408 U.S. at 477 (citation omitted). The twofold purpose behind parole is "to help individuals reintegrate into society as constructive individuals as soon as they are able ... [while] alleviat[ing] the costs to society of keeping an individual in prison."*Id.*

"There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."*Greenholtz v. Inmates of Neb. Penal & Corr. Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979)."The essence of parole is release from prison, before the completion of sentence, *on the condition that the prisoner abide by certain rules during the balance of the sentence."Morrissey,* 408 U.S. at 477 (emphasis added). To ensure the security and effectiveness of release, "those who are allowed to leave prison early are subjected to specified conditions for the duration of their terms ... [which] restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen."*Id.* at 478."The enforcement leverage that supports the parole conditions derives from the authority to return the parolee to prison to serve out the balance of his sentence if he fails to abide by the rules."*Id.* at 478–79.

As a general matter, it is well-established that "the [New York] Parole Board's discretionary imposition of special conditions is not subject to judicial review in the absence of a showing that the board or its agents acted in an arbitrary and capricious manner. Review of conditions of parole are generally matters for state courts."*Walker v. Mattingly,* 09–

CV–845–JTC, 2012 U.S. Dist, LEXIS 48547, at *18, 2012 WL 1160772 (W.D.N.Y. Apr. 5, 2012) (internal quotation and citations omitted). Moreover, as explained below, the courts in the Second Circuit have addressed and generally rejected constitutional objections to the application of the provisions of SORA to parolees, including the objections asserted by plaintiff.

### Ex Post Facto Clause and Eighth Amendment Claims

Article I, § 9 of the Constitution prohibits the States from passing any laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins v. Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). The Ex Post Facto Clause of the Constitution "applies only to penal statutes which disadvantage the offender affected by them." *Id.* (emphasis added). In *Doe v. Pataki,* 120 F.3d 1263, 1284–1285 (2d Cir.1997), the Second Circuit held that the SORA's registration and community notification provisions were not "punishments" within the meaning of the Ex Post Facto Clause. See *also Smith v. Doe,* 538 U.S. 84, 105–06, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (holding that retroactive application of Alaska's sex offender registry statute did not violate the Ex Post Facto clause). *Accord, e.g., Manzullo v. New York,* No. 07 CV 744(SJF), 2010 U.S. Dist. LEXIS 32089, at *22, 2010 WL 1292302 (E.D.N.Y. Mar. 29, 2010) (denying habeas relief to petitioner claiming that both the registration and notification provisions of the SORA constitute punishment for purposes of the Ex Post Facto clause) (citations omitted). Accordingly, to the extent that plaintiff is challenging any conditions of parole which were attributable to his having been determined to be subject to SORA, his allegations fail to state a claim that the imposition of the conditions violated the Ex Post Facto Clause or, by parity of reasoning, the Eighth Amendment's proscription of cruel and unusual punishments.

**\*4** To the extent that the sex offender conditions of parole to which plaintiff objects were or may have been imposed not incident to SORA but rather as special conditions of release falling within the range of conditions that the Division of Parole customarily imposes, see *M.G. v. Travis,* 236 A.D.2d 163, 167–68, 667 N.Y.S.2d 11 (N.Y.App. Div. 1st Dep't 1997) (discussing discretionary authority of New York State Division of Parole to impose special conditions of release), the Court likewise determines that such conditions do not constitute cruel and unusual punishment within the meaning of the Eighth Amendment or the Ex Post Facto Clause. *See Blake v. Fischer,* 09–CV–266, 2010 U.S. Dist. LEXIS 68224, at *29 (N.D.N.Y. May 5, 2010) (rejecting claim that

placement in sex offender training programs or setting special conditions of parole amounted to an infliction of cruel and unusual punishment); *Robinson v. N.Y. State,* 09–CV–455, 2010 U.S. Dist. LEXIS 144553, at *19–20 (rejecting Eighth Amendment objections to prerelease and special conditions of parole). Accordingly, the Court concludes that plaintiff's objections to the special conditions of parole to which he was subjected do not constitute punishment and thus fail to state a claim under the Eighth Amendment or the Ex Post Facto Clause.

### Due Process Claims

"To award damages under 42 U.S.C. § 1983 for an alleged violation of procedural due process, a court must find that, as the result of conduct performed under color of state law, the plaintiff was deprived of life, liberty, or property without due process of law." *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). There is no dispute in this case that the defendants acted under color of state law. "What remains is a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest ... and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Id.* at 351–52 (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460–61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). The courts have also consistently held that a parolee has no constitutionally protected interest in being free from special conditions of release. *Bod die v. Chung,* 2011 U.S. Dist. LEXIS 48256, at *4–5, 2011 WL 1697965 (E.D.N.Y. May 4, 2011) (rejecting section 1983 challenge to special conditions); *Cooper v. Dennison,* 08–CV–6238, 2011 U.S. Dist. LEXIS 31221, at *32, 2011 WL 1118685 (W.D.N.Y. Mar. 24, 2011) (quoting *Pena v. Travis,* 01–CV–8534 2002 U.S. Dist LEXIS 24709, 2002 WL 31886175 (S.D.N.Y. Dec. 27, 2002) ("Because the imposition of conditions is left to the discretion of the Board of Parole and parole officers, plaintiff does not have a protected liberty interest in being free from special conditions.")); *see also* 9 N.Y. Comp.Codes R. & Regs. ("N.Y.C.R.R."), tit. 9, § 8003.3 ("A special condition may be imposed upon a releasee either prior or subsequent to release. The releasee shall be provided with a written copy of each special condition imposed. Each special condition may be imposed by a member or members of the Board of Parole, an authorized representative of the Division of Parole, or a parole officer."). In addition, "the Parole Board's discretionary imposition of special conditions is not subject to judicial review in the absence of a showing that the board or its agents acted in an arbitrary and capricious manner. Review of conditions of parole are generally matters for state courts." *Walker v. Mattingly,* 09–CV–845–JTC,

2012 U.S. Dist. LEXIS 48547, at *18, 2012 WL 1160772 (W.D.N.Y. Apr. 5, 2012) (internal quotation and citation omitted).“However, where the condition is not related to the parolee's criminal history or to the State's interests, it may be prone to tailoring or invalidation.”*Robinson,* 2010 U.S. Dist. LEXIS 144553, at *23 (citing cases invalidating conditions of parole not reasonably related to parolee's offense).

**\*5** Accordingly, to the extent that plaintiff is alleging a protected liberty interest to be free from the special conditions of parole to which he objects, such an “interest” is not protected and is therefore not a sufficient basis for a Fourteenth Amendment due process violation. *See McCloud v. Kane,* 491 F.Supp.2d 312, 317 (E.D.N.Y.2007). However, liberally construing the complaint as the Court is obligated to do, the Court concludes that Maldonado's allegations concerning the restrictions and resulting hardships that the conditions imposed on him have had (see Docket No. 1, p. 10, ¶ 20 [enumerating restrictions upon plaintiff's relationship with his family allegedly caused by conditions of parole] ) “sufficiently allege[ ] a due process claim regarding the *substance* of the special conditions at issue here and the basis for their imposition.”*Robinson,* 2010 U.S. Dist. LEXIS 144, at *26 (citing *Bod die v. N.Y. State Div. of Parole,* 285 F.Supp.2d 421, 428–29 (S.D.N.Y.2003)) (emphasis in quotation added). Accordingly, at this early stage of the proceeding, the Court will allow plaintiff's due process claim against the defendants to go forward, to the extent that it can be construed as objecting to the *substance, i.e.,* the nature and extent of, the conditions imposed upon him and their relation to his offenses.

### *PLAINTIFF'S MOTIONS*

#### *Preliminary Injunctive Relief*
Plaintiff requests preliminary injunctive relief with respect to the sexual offender-related conditions that have been included in his conditions of parole. (Docket No. 3). While acknowledging that he was incarcerated for a parole violation at the time he filed the motion (*Id.,* p. 2, ¶ 6), he maintains that a temporary restraining order is appropriate because he “risks being violated for one of the unconstitutional conditions imposed upon **him** once released.”(*Id.,* p. 6, ¶ 32).

A party seeking a preliminary injunction must demonstrate “(1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits

and a balance of hardships tipping decidedly toward the party seeking injunctive relief.”*Resolution Trust Corp. v. Elman,* 949 F.2d 624, 626 (2d Cir.1991)); *PSC, Inc. v. Reiss,* 111 F.Supp.2d 252, 254 (W.D.N.Y.2000). The “ ‘serious questions' prong is also frequently termed the ‘fair ground for litigation' standard.”*N.A.A.C.P., Inc. v. Town East Haven,* 70 F.3d at 223.

Here, the Court determines that plaintiff satisfies neither prong of the preliminary injunction standard. As noted, plaintiff was incarcerated at the time he filed the motion seeking preliminary injunctive relief and he remains incarcerated, and therefore is not presently subject to the conditions of parole that he seeks to have the Court enjoin. Moreover, while the Court is allowing his due process claim against defendants to proceed, plaintiff has not, at this juncture, demonstrated sufficient likelihood of success on the merits of his complaint, or “sufficiently serious questions going to the merits” and a balance of hardships in his favor to warrant the granting of his request for a temporary restraining order. Plaintiff's motion for preliminary injunctive relief is therefore denied.

#### *Appointment of Counsel*
**\*6** Plaintiff has also moved for the appointment of counsel (Docket No. 4). A more fully developed record will be necessary before the Court can determine whether plaintiffs chances of success warrant the appointment of counsel. Therefore, plaintiffs motion is denied without prejudice to its renewal at such time as the existence of a potentially meritorious claim may be demonstrated. *See Hendricks v. Coughlin,* 114 F.3d 390, 392 (2d Cir.1997) (when determining whether to appoint counsel, the Court must first look to the “likelihood of merit” of the underlying dispute).

### *CONCLUSION AND ORDER*

In accordance with the foregoing,

IT HEREBY IS ORDERED, that plaintiff's motion to proceed *in forma pauperis* (Docket No. 2) is granted;

FURTHER, that plaintiff's motion for preliminary injunctive relief (Docket No. 3) is denied;

FURTHER, that plaintiff's motion for the appointment of counsel (Docket No. 4) is denied without prejudice;

FURTHER, that plaintiff's Ex Post Facto Clause claims against the defendants are dismissed with prejudice;

FURTHER, that plaintiff's Eighth Amendment claims against the defendants are dismissed with prejudice;

FURTHER, that plaintiff's Due Process claims against the defendants which seek to challenge the substance of the conditions of parole imposed upon plaintiff may go forward;

FURTHER, the Clerk of the Court is directed to file plaintiff's papers, and to cause the United States Marshal to serve copies of the Summons, Complaint and this Order upon the defendants without plaintiff's payment therefore, unpaid fees to be recoverable if this action terminates by monetary award in plaintiff's favor;

FURTHER, that pursuant to 42 U.S.C. § 1997e(g)(2), the defendants are directed to answer the Complaint.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4461647

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Churney v. Chicago Housing Authority, N.D.Ill., February 14, 2013

2010 WL 3926887
United States District Court,
D. Connecticut.

Sandra SUPER, Plaintiff,

v.

J. D'AMELIA & ASSOCIATES, LLC; Wilfred J. Rodie, Sr.; Patricia Wilson–Coker, individually and as Commissioner of the Department of Social Services; Daniel Murphy; Carla Corrigan; and Kevin Nelson, individually and as Executive Director of the Stratford Housing Authority, Defendants.

No. 3:09cv831 (SRU). | Sept. 30, 2010.

**Attorneys and Law Firms**

Alan L. Rosner, Bridgeport, CT, Robert J. Kor, West Hartford, CT, for Plaintiff.

Benjamin D. Gettinger, Donn A. Swift, Lynch, Traub, Keefe & Errante, New Haven, CT, Peter D. Clark, Law Office Of Peter C. Clark, Shelton, CT, Philip J. O'Connor, Gordon, Muir & Foley, Hugh Barber, Attorney General's Office, Hartford, CT, Catherine L. Creager, John B. Kaiser, Kevin A. Coles, Coles, Baldwin & Kaiser, LLC, Fairfield, CT, for Defendants.

*RULING ON MOTIONS TO DISMISS and MOTION FOR LEAVE TO AMEND THE COMPLAINT AND JOIN ADDITIONAL PARTIES*

STEFAN R. UNDERHILL, District Judge.

**\*1** This case presents a claim of housing discrimination against multiple state, local, and private defendants responsible, in part, for the administration of the plaintiff's federal housing benefits and the provision of her housing. Several defendants—J. D'Amelia & Associates, LLC, Patricia Wilson–Coker, Carla Corrigan, and Kevin Nelson—moved to dismiss the plaintiff's complaint. Those motions, which are largely duplicative, present the question whether a mentally ill person who commits a crime at her residence is categorically barred from seeking a reasonable accommodation to continue receiving federal housing

benefits while she obtains mental health treatment that would help prevent her from committing any similar crimes in the future. The defendants argue that the plaintiff cannot, as a matter of law, obtain relief on the facts she has pled. In response, the plaintiff argues that it is possible for a fact-finder to determine that her requested accommodation was necessary and reasonable and, therefore, her complaint should not be dismissed.

For the following reasons, I conclude that the motions to dismiss should be denied because the plaintiff's complaint states a viable claim for relief. The touchstone in this case is the reasonableness of the plaintiff's requested accommodation, an issue of fact to be resolved at trial or, at the earliest, summary judgment. But I also recognize that the question the plaintiff presents is a close one. The defendants' alleged failure to accommodate her arises from their application of a neutral policy prohibiting the provision of rental assistance to convicted felons and tenants who have committed violent crimes on their property. That policy is, on its face, entirely reasonable. Nevertheless, on the allegations put forward in the plaintiff's complaint, the defendants' application of the policy against the plaintiff also could be found to be a denial of a reasonable accommodation in violation of federal antidiscrimination laws. The defendants' motions to dismiss are therefore denied. [1]

**I. Background**

The following facts are drawn from the complaint. The plaintiff, Sandra Super, is a psychiatrically impaired woman who receives social security disability payments on account of her mental illness. From June 2001 until November 2008, she rented an apartment in Stratford, Connecticut owned by Wilfred J. Rodie, Sr. In November 2007, Super applied for a Section 8 rental subsidy; she and Rodie signed a new lease with a Section 8 addendum on February 12, 2008. Super received Section 8 assistance from February 12, 2008 until her benefits were terminated in November of that year.

Section 8, a federal housing subsidy program, provides rental assistance in the form of payments made directly to landlords; eligible tenants receive subsidies equal to the difference between the tenancy's rental value and a percentage of the tenant's monthly income that she pays in rent. [2] *See generally Taylor v. Housing Auth. of New Haven*, 267 F.R.D. 36, 54–55 (D.Conn.2010) (describing framework of Section 8 tenant assistance). The program is funded federally but administered at the state and local levels by public

housing agencies ("PHAs"). The Connecticut Department of Social Services ("DSS") serves as the state's PHA and subcontracts Section 8 administration to local subagencies. The subagencies responsible for Super's Section 8 payments were the Stratford Housing Authority ("SHA"), a public corporation, and J. D'Amelia & Associates ("D'Amelia"), a Connecticut limited liability corporation.

**\*2** Rodie employed a worker, Daniel Murphy, to perform maintenance on his buildings, including Super's. (Murphy may also have lived in Super's building.) Murphy and Super had a foul relationship. Between November 2007 and May 2008, Murphy regularly antagonized Super by verbally harassing her and, in some cases, threatening her physical safety. Super complained to another of Rodie's employees about Murphy's obnoxious and threatening behavior, and left a voice message for Rodie to the same effect. Rodie never called Super back, and Murphy was neither disciplined nor reassigned to a different building.

On May 26, 2008, Super and Murphy got into a physical altercation on the steps leading to Super's apartment. Murphy called Super several names and used obscene language, and pressed her doorbell repeatedly in a harassing manner. Murphy's conduct "exacerbated plaintiff's mental impairments and caused her great emotional upset."Cmplt. ¶ 29. Riled up, Super confronted Murphy with a knife, cutting his shirt but not injuring him physically. After her opening strike, Super retreated and ran up the stairs. Murphy tackled her and the two sprawled into Super's apartment. Murphy subdued her with the assistance of his wife who was nearby, sprayed Super's face with pepper spray. The police were called and Super was arrested. She was charged with attempted first-degree assault and breach of the peace. Her bond was set at $250,000, an amount that she was unable to pay. Immediately after Super's arrest, Rodie attempted to evict her. He notified Super's mother on June 5, 2008 that she had two weeks to clear Super's belongings out of the apartment. Super's mother removed Super's property sometime that month and Rodie changed the locks on the apartment.

Super was released from prison on July 22, 2008 after agreeing to plead guilty to the assault charge and accept a five-year suspended sentence. That plea and sentence were entered on September 16, 2008. As part of her suspended sentence, Super was required to undergo mental health screening and treatment.

Six days later, SHA mailed a notice to Super that her Section 8 benefits were to be cancelled. Super requested a hearing; that hearing was noticed on November 6, 2008 and held on November 17, 2008 before Carla Corrigan, a D'Amelia employee. At the hearing, a social worker testified on Super's behalf and put forward three letters—two from personnel at Bridge House, a center for adults recovering from psychiatric difficulties, and one from a social worker at Southwest Community Health Center—requesting that D'Amelia and SHA make a reasonable accommodation to permit Super to maintain her rent subsidy while she underwent court-ordered mental health treatment. After the hearing, Corrigan issued a written decision affirming the denial of Super's Section 8 benefits. In that decision, Corrigan ruled that Super's assault conviction eliminated her Section 8 eligibility and that no accommodation could be made for her.

**\*3** Super commenced this suit in May 2009, alleging violations of her rights under the Fair Housing Act and its amendments ("FHA"), the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("Section 504"), in addition to other claims. She seeks injunctive relief and compensatory and punitive damages. Super sues the following defendants: Rodie, Murphy, D'Amelia and Corrigan, Kevin Nelson, the executive director of SHA, and Patricia Wilson–Coker, the DSS Commissioner. Defendants Wilson–Coker, D'Amelia, Corrigan, and Nelson have moved to dismiss Super's claims against them. Super has also filed a motion for leave to amend her complaint, which Wilson–Coker opposes.

## II. Standard of Review

A motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) should be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The function of a motion to dismiss is "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof."Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir.1984) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir.1980)).

When deciding a motion to dismiss pursuant to Rule 12(b) (6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. Ashcroft v. Iqbal, 556U.S. 662,

[—— – ——,](url) [129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009);](url) *Bell Atl. Corp. v. Twombly,* [550 U.S. 544, 562–63, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007);](url) *Leeds v. Meltz,* [85 F.3d 51, 53 (2d Cir.1996).](url)

## III. Discussion

### A. *Motions to dismiss*
The defendants' motions to dismiss are essentially redundant. [3] (Indeed, the D'Amelia–Corrigan and Nelson papers copy verbatim Wilson–Coker's motion to dismiss, which was filed first.) Therefore, there is no need to address each defendant's motion separately. Instead, it is best to address one at a time the issues that the motions jointly raise.

The relevant portions of the FHA, ADA, and Section 504 offer the same guarantee that a covered entity, such as a Section 8 administrator, must provide reasonable accommodations in order to make the entity's benefits and programs accessible to people with disabilities. [4] Analysis of a reasonable accommodation claim under the three statutes is treated the same. *Tsombanidis v. W. Haven Fire Dep't,* [352 F.3d 565, 573 & n. 4 (2d Cir.2003);](url) *Bryant Woods Inn, Inc. v. Howard County,* [124 F.3d 597, 603 (4th Cir.1997);](url) *Siefken v. Vill. of Arlington Heights,* [65 F.3d 664, 666 n. 1 (7th Cir.1995).](url) For the purposes of simplicity, I refer to Super's claims as if they were brought under the FHA, although any discussion of her FHA claim applies equally to her ADA and Section 504 claims unless noted otherwise.

 **\*4** The defendants move to dismiss Super's claims that they failed to provide a reasonable accommodation on the following grounds: (1) the "accommodation" requested in Super's complaint does not amount to a reasonable accommodation as a matter of law; (2) the pleadings do not establish that her requested accommodation was "necessary" to permit her to continue living independently in spite of her disability; (3) Super has not alleged that her disability was the sole basis for the termination of her Section 8 benefits; (4) the pleadings do not allege sufficient personal involvement by the defendants to establish liability under the FHA; and (5) certain defendants—namely, DSS and Wilson–Coker—are immune from suit under the Eleventh Amendment. Before examining the bases for the defendants' motions to dismiss, however, it is helpful to set forth the relevant statutory and regulatory provisions governing Section 8, the benefits of which Super claims she was unlawfully denied, and its interaction with the FHA, ADA, and Section 504. Once the

governing law is set forth, I turn to the defendants' specific bases for seeking dismissal of Super's complaint.

### 1. *Section 8 and the reasonable accommodation requirement of the FHA, the ADA, and Section 504*
Section 8 was established by the United States Housing Act ("USHA") and, as mentioned above, provides a federal subsidy in the form of a rental voucher for low-income tenants. Under the statutory and regulatory framework, each of the parties to an individual Section 8 voucher—the tenant, the landlord, and the PHA—is subject to different requirements with respect to ensuring that Section 8 housing remains crime-free. A tenant, for example, "may not engage in drug-related criminal activity or violent criminal activity or other criminal activity that threatens the health, safety, or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises."[24 C.F.R. § 982.551(l).](url) Similarly, a landlord must include language in the lease stating that such violent criminal activity "shall be cause for termination of the tenancy."[42 U.S.C. § 1437f(o)(7)(D).](url) And a PHA is responsible for "establish[ing] standards that allow the PHA to terminate assistance under the program for a family if the PHA determines that any household member has violated the family's obligation under [§ 982.551](url) not to engage in violent criminal activity."[24 C.F.R. § 982.553(b).](url) When a PHA uses a criminal record to terminate a tenant's Section 8 assistance, it must notify the tenant and give her "an opportunity to dispute the accuracy and relevance of that record."[§ 982.553(d)(2).](url) By the same token, a hearing is required for terminating Section 8 assistance for the tenant's criminal activity. § 982.555(a)(1)(v).

Section 8, however, must be administered in a way that complies with "all equal opportunity requirements imposed by contract or federal law," including the FHA, ADA, and Section 504; moreover, PHAs must be certified as administering their Section 8 programs accordingly. [24 C.F.R. § 982.53(a)-(b).](url) One such equal opportunity requirement is the reasonable accommodation rule of the FHA, found in [42 U.S.C. § 3604(f)(3)(B),](url) which states that a landlord or PHA may not discriminate against a disabled tenant by failing to make "reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."*See also* [24 C.F.R. § 982.552(c)(2)(iv)](url) (mandating that if the tenant is disabled, the PHA's final decision with respect to denial of Section 8 assistance must consider whether

a reasonable accommodation would enable the tenant to continue receiving her rental subsidy).

**\*5** The right to an accommodation is neither automatic nor unlimited, however. Rather, to prove that she is entitled to an accommodation, a plaintiff such as Super must demonstrate that the accommodation is "(1) reasonable, and (2) necessary, (3) to afford a disabled person the equal opportunity to use and enjoy a dwelling." *Oconomowoc Residential Programs v. City of Milwaukee,* 300 F.3d 775, 783–84 (7th Cir.2002) (citing 42 U.S.C. § 3604(f)(3)(B) and cases). The plaintiff has the burden of producing evidence establishing a prima facie case, although she only has the burden of persuasion for the second and third elements. *Id.; see also U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 402, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002) (favoring lower courts' burden-shifting approach in ADA and Section 504 cases); *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 138 (2d Cir.1995) (establishing analogous burden-shifting framework in Section 504 case). That is, Super must allege—and eventually prove—sufficient facts to demonstrate a facial claim that the defendants denied her an accommodation that was reasonable and necessary to afford her equal opportunity to use and enjoy her apartment.[5]

One factor that affects the reasonableness of a requested accommodation is safety. *See Oconomowoc,* 300 F.3d at 786 (accepting that public safety can be a basis for not granting an accommodation, but only if there is particular evidence introduced of the tenant's safety risk). For example, the FHA specifically excepts landlords from providing reasonable accommodations to a tenant who "constitute[s] a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damages to the property of others." 42 U.S.C. § 3604(f)(9). But if an accommodation would permit a disabled tenant to use and enjoy housing and eliminate the safety risk, then the landlord is obligated to make it. *E.g., Arnold Murray Constr., LLC v. Hicks,* 621 N.W.2d 171, 175 (S.D.2001) (discussing House Judiciary Committee report on FHA's "direct threat" exception); *see generally* Jennifer L. Dolak, Note, *The FHAA's Reasonable Accommodation & Direct Threat Provisions As Applied to Disabled Individuals Who Become Disruptive, Abusive, or Destructive in Their Housing Environment,* 36 Ind. L.Rev. 759 (2003) (describing law of reasonable accommodation for tenants who pose nuisance or safety risks because of their disabilities). Although this motion to dismiss concerns claims against the PHA, and not the landlord, the inclusion of the direct threat exception in § 3604 is a useful restatement of the principle that a disabled tenant's right to an accommodation

under the FHA is checked by the competing value of ensuring the safety of other tenants and the public.

Moreover, in a case where the requested accommodation is an exception to the application of a neutral rule, such as the defendants' prohibition of Section 8 assistance for convicted felons or people who have committed acts of violence on their property, the plaintiff faces a more difficult burden of establishing that her request is reasonable. "[S]uch adjustments are ordinarily not *reasonable* accommodations, and therefore are required only in unusual circumstances." *Giebler v. M & B Assocs.,* 343 F.3d 1143, 1154 (9th Cir.2003) (emphasis in original) (applying *Barnett,* 535 U.S. at 401). Super, rather, must plead "that special circumstances warrant a finding that the requested accommodation is reasonable on the particular facts." *Id.* (quoting *Barnett,* 535 U.S. at 405). Ultimately, the reasonableness of Super's requested accommodation will be a highly-fact specific inquiry that "evaluates the desireability of a particular accommodation according to the consequences that the accommodation will produce." *Borkowski,* 63 F.3d at 138.

**\*6** That leads to the core dilemma of this case: resolving the tension between accommodating an individual disabled tenant without jeopardizing the welfare of her neighbors and the public. The defendants contend that safety is a, if not *the,* paramount virtue of Section 8, and therefore the denial of rental assistance to Super—which arose from the application of a neutral policy against a tenant convicted of a violent felony committed at her residence—was warranted and legal. Super, by contrast, argues that although safety is important, it does not absolve the PHA of its responsibility to make a fact-specific determination that a disabled person's possible dangerousness cannot reasonably be accommodated and to make reasonable accommodations that permit a disabled tenant to continue receiving Section 8 payments. According to Super's complaint, the defendants failed in both regards. Having set forth the governing law, I turn now to the defendants' asserted grounds for dismissing Super's complaint.

### 2. Was Super's request an "accommodation" under the FHA?

Although it is not the defendants' leading argument in their briefs, the issue whether Super requested an accommodation is an appropriate place to start because if Super's request is not cognizable as an "accommodation," then she has no

claim of discrimination under the FHA, ADA, or Section 504. The defendants characterize Super as requesting only a "second chance"—i.e., a pardon of her previous misconduct with no other conditions or modifications to her continued residence—to continue receiving Section 8 assistance. They argue that a request for a second chance and an exception to the application of a neutral policy does not constitute an accommodation under the FHA. In support, they cite several decisions where courts have held that, in the employment context, a "second chance" reinstatement after termination is, as a categorical matter, not a reasonable accommodation under Title I of the ADA, which prohibits an employer from discriminating on the basis of disability. *E.g., Burroughs v. City of Springfield,* 163 F.3d 505, 507–08 (8th Cir.1998); *Siefken,* 65 F.3d at 666–67; *Van Ever v. N.Y. State Dep't of Corr. Servs. at Sing–Sing Corr. Facility,* No. 99cv12348 (SAS), 329 Or. 589, 994 P.2d 130, 2000 WL 127713, at *3–*4 (S.D.N.Y. Nov. 21, 2000); *Corr v. MTA Long Island Bus,* 27 F.Supp.2d 359, 368 (E.D.N.Y.1998), *aff'd,*199 F.3d 1321 (2d Cir.1999) (unpublished opinion).

The defendants' contention that so-called "second chances" cannot be accommodations under the FHA is an overstatement. Courts have accepted a second chance—that is, a tenant's opportunity to remain in her dwelling notwithstanding the landlord's disability-neutral justification for eviction—as an accommodation, provided that it is coupled with the tenant seeking assistance for her disability. *See, e.g., Boston Hous. Auth. v. Bridgewaters,* 452 Mass. 833, 898 N.E.2d 848, 859 (Mass.2009) (holding that tenant's request for housing authority to "depart from its policy of evicting tenants for engaging in a violent act, and reinstate his tenancy" constituted an accommodation under the FHA); *City Wide Assocs. v. Penfield,* 564 N.E.2d 1004 (Mass.1991) (upholding landlord's refusal to take further steps toward eviction as an accommodation); *cf. Groner v. Golden Gate Gardens Apartments,* 250 F.3d 1039, 1042 (6th Cir.2001) (describing landlord as agreeing to accommodate tenant by extending his lease one month while tenant sought treatment, although ultimately holding that subsequent accommodation was not reasonable). And the Department of Housing and Urban Development and the Department of Justice concur that an accommodation may take the form of permitting the continuance of a tenancy while a tenant seeks treatment. Joint Statement of the Dep't of Hous. & Urban Dev. & the Dep't of Justice, *Reasonable Accommodations Under the Fair Housing Act* 5 (May 17, 2004), Attach. 1 to Pl.'s Mem. in Opp'n (doc. # 51). Indeed, decisions that have held a continued tenancy not to be an accommodation have done

so not on the basis that a so-called "second chance" is categorically not an accommodation, but because, on the facts presented, a continued tenancy would not have permitted the tenant to enjoy her dwelling and eliminate the risks to others. *See, e.g., Groner,* 250 F.3d at 1045 (concluding that tenant failed to put forward evidence showing that proposed accommodation would be reasonable); *Arnold Murray Constr.,* 621 N.W.2d at 176 (upholding trial court's finding that tenant posed a direct threat to others and that his proposed accommodation to delay eviction would not have eliminated that threat).*But see Evans v. UDR, Inc.,* 644 F.Supp.2d 675, 684–85 (E.D.N.C.2009) (holding that accommodation to policy against renting to felons whose crimes were directly related to their mental disabilities was not required under FHA because FHA's purpose was "the elimination of stereotypes based on physical and mental disabilities" and not "perceptions about the criminal histories of those with disabilities").

**\*7** Furthermore, the employment cases that the defendants cite are distinguishable. The defendants' cited decisions offer brief, cursory explanations for why a second chance does not qualify as an accommodation. But they can be generally unified as expressing the point that a request for an accommodation is valid only if it will effectively enable the person to perform the essential functions of his or her position. *Cf. U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 401, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002) (defining, in ADA case, an "accommodation" in terms of its effectiveness in enabling an employee to work). In all of the decisions the defendants cite, the requested "second chance" would be an ineffective way of ensuring that the employee could perform her job.

In *Burroughs,* the plaintiff police officer was diagnosed as a diabetic before being hired and had assured his employer that his disability "was under control," but proved unable to perform his work because of bouts of hypoglycemia. 163 F.3d at 506, 507.The *Burroughs* Court deemed the police officer's request to remain in his position on the promise that he would improve his glucose monitoring to be too conjectural and insufficiently effective in permitting him to perform the essential functions of his position. *Id.* at 507–08.*Siefken,* on which the *Burroughs* Court heavily relied, is similar: in that case, involving another known diabetic police officer who suffered a glucose-related spell during a shift, the Seventh Circuit denied a "second chance" as an accommodation because the plaintiff had already failed "to control a controllable disability" and his continued

employment would do nothing to ensure that he would control it in the future. 65 F.3d at 666–67.And *Corr* confirms that a second chance is an inappropriate accommodation if it does not permit an employee to perform the essential functions of his position immediately; in other words, if the risk that the employee cannot perform his job's tasks is still present even with a modification, then the requested modification to his employment is not an accommodation. 27 F.Supp.2d at 368.

In total, those cases hold that an employee with a manageable disability who fails to manage it appropriately is not entitled to a second chance to continue his employment as he did before. That is because a second chance, by itself, offers no additional safeguard or guarantee of effectiveness. In other words, a second chance is not appropriate when there is no evidence that maintaining the status quo will be sufficient to keep the person employable.

Super is requesting that her Section 8 PHA allow her to continue receiving her rental subsidy—i.e., she proposes as an accommodation that the defendants continue what they did before. Her request is distinguishable from those in the defendants' employment cases, however, because she is seeking psychiatric treatment that she was not previously receiving, [6] and which she is compelled to receive pursuant to a court order. Unlike the diabetic employee cases, Super did not have adequate mental health therapy before and after the requested accommodation. The accommodation, therefore, is not a return to the status quo before her attempted assault; instead, it is a means of improving Super's condition from before her arrest and preventing any future crimes from occurring. Indeed, if an analogy is to be drawn to the disability employment cases the defendants invoke, Super's request to continue receiving rental subsidies is equivalent to an accommodation granting an employee leave to seek treatment for his or her disability. *See, e.g., Van Ever,* 2000 WL 1727713, at *3–*4 (holding than the ADA requires that an alcoholic employee be given unpaid time off to receive treatment, but that the statute "does not protect an alcoholic from the consequences of his behavior"). That is, Super alleges that she should have been permitted to continue receiving rental subsidies while she received mental health treatment, akin to an employee staying on an employer's books during unpaid leave for medical treatment, but that she may still lose her benefits if she engages in another violent outburst or if her treatment proves unproductive. In the employment context, to which the defendants want to analogize this case, disabled employees are entitled to some form of accommodation to permit them time to obtain the

medical help they need. Super, arguably, should be entitled to the same kind of accommodation with respect to her housing benefits.

**\*8** It is therefore not appropriate to hold that an extension of Super's disability benefits while she receives mental health treatment cannot be an accommodation as a matter of law. An extension of Section 8 benefits can serve as an accommodation when there is evidence to support the plaintiff's contention that continued rental subsidies will effectively allow her to use and enjoy her dwelling without posing a threat to her neighbors and the public. Dismissal of Super's claims against the defendants is not warranted, therefore, because the complaint, when taken in the light most favorable to Super, alleges facts that could support a finding that her request to continue receiving Section 8 benefits while she sought court-ordered psychiatric care was a reasonable accommodation.

Wilson–Coker, in her reply brief, makes an additional argument that a so-called "second chance" cannot be an accommodation under the FHA. She argues that permitting such an accommodation would create discord between the FHA and the USHA, which establishes the Section 8 program, because it favors the FHA's reasonable accommodation requirement relative to the safety interest found in Section 8's law and regulations. In support, Wilson–Coker cites *Traynor v. Turnage,* 485 U.S. 535, 547–51, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988), a case in which the Supreme Court applied the "cardinal rule" against legislative repeals by implication to uphold a provision in the "G.I. Bill" against the subsequently passed Rehabilitation Act. The defendant's argument misses the mark, however, for the simple reason that permitting a mentally disabled tenant to receive an accommodation of continued benefits does not create disharmony between the Section 8 provisions of the USHA and the reasonable accommodation requirement of the FHA. Indeed, Wilson–Coker points to no specific provision in the USHA that would be implicitly repealed by holding that a PHA may have to permit a tenant to continue to receive benefits after she has committed a crime in her dwelling. *Cf. Traynor,* 485 U.S. at 547 (describing tension between G.I. Bill provision barring tardy benefit application by "willfully" alcoholic veterans and Section 504's requirement that government services provide reasonable accommodations for disabled people). The defendant relies entirely on a purposive statement of 42 U.S.C. § 1437(a)(1)(A) that the Section 8 voucher program is to "remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings to low-income

families."Notably, Wilson–Coker does not account for 24 C.F.R. § 982.552(c)(2)(iv), which, although an administrative regulation and not a legislative statute, mandates a PHA to consider whether a reasonable accommodation would make it possible for a tenant to maintain her Section 8 assistance.

Contrary to the defendant's claims, there is nothing inconsistent between (1) the general proposition that Section 8 is supposed to make living conditions safer, and (2) permitting a mentally disabled person to continue receiving rent subsidies so long as that accommodation is reasonable and will not pose a threat to others. Wilson–Coker is wrong to say that it would be a "mockery" to Section 8 to find that Super's proposed accommodation might be legally acceptable. Def.'s Reply 17 n. 9. The PHA in this case may very well have been entitled to terminate Super's Section 8 assistance because of her criminal conduct. But the reason the PHA defendants were authorized to do so is not because granting such an accommodation is inherently inconsistent with Section 8, but because the accommodation is not reasonable or necessary under the FHA. The safety purpose of Section 8, in other words, is adequately protected by the FHA's definition of accommodations as only those that are reasonable, i.e., those that will allow a mentally disabled tenant to use and enjoy her dwelling while also neutralizing whatever threat she poses to her neighbors and the public.

### 3. Was Super's requested accommodation necessary?

**\*9** Next, the defendants argue that Super has not pled facts showing that the requested accommodation is necessary to afford her equal opportunity to use and enjoy her dwelling.[7] In order to allege the necessity of her accommodation, Super "must show that, but for the accommodation, [she] likely will be denied an equal opportunity to enjoy the housing of [her] choice."*Tsombanidis,* 352 F.3d at 578 (quotation omitted); *see also Bryant Woods,* 124 F.3d at 604 ("The 'necessary' element ... requires the demonstration of a direct linkage between the proposed accommodation and that 'equal opportunity' to be provided to the handicapped person. This requirement has attributes of a causation requirement."). The defendants, citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), argue that Super has failed to meet her obligation to plead sufficient facts to establish a plausible claim that Section 8 rental assistance was necessary for her to live where she wanted.

*Iqbal* requires that Super's complaint must be more than a conclusory "formulaic recitation of the elements" of a discrimination claim, *id.* at 1949, 1951, and that Super's complaint alleges sufficient facts for a judge, drawing on his or her "judicial experience and common sense," to find that it states a "plausible claim" for relief. *Id.* at 1950.Super has certainly done more than recite the elements of an FHA claim; in her complaint, she makes factual assertions to demonstrate how the defendants allegedly failed to provide her a reasonable accommodation. And there is nothing in Super's complaint with respect to the necessity of her requested accommodation that is implausible. Super has alleged that she is a mentally disabled woman who receives social security benefits; although she lived for years without Section 8 assistance, she applied for and received them in February 2008 and, after their termination and her eviction, she moved in with her parents, where she resides to this day. Those allegations establish a plausible causal link between her disability, her requested accommodation, and her housing: without the requested accommodation of continued Section 8 benefits, Super cannot obtain housing on her own because of her mental illness. The asserted facts state a plausible claim that Super needed Section 8 assistance in order to continue living independently and in the housing of her choice.

Thus, the complaint, when read in the light most favorable to Super, shows that her mental disability (1) limits her ability to work and earn enough to live independently, and (2) has hindered her ability to receive a rental subsidy because her psychiatric illness allegedly led her to commit a crime, the combination of which renders her ineligible for Section 8 and economically unable to live on her own. The pleadings demonstrate a plausible, and not merely possible, case for the necessity of Super's requested accommodation. *Cf. Logan v. Sectek, Inc.,* 632 F.Supp.2d 179 (D.Conn.2009) (holding that plaintiff pled enough facts to establish "possible," but not "plausible," disability within the meaning of the ADA).

### 4. Was Super's Section 8 rental assistance denied solely on the basis of her disability?

**\*10** The defendants argue that in order for Super to succeed on her ADA and Section 504 claims (but not her FHA claim), she must allege that the defendants' denial of Section 8 assistance and refusal to make an accommodation were based solely on her disability. That, however, is a misstatement of the law. It is true that in ADA and Section 504 claims for intentional discrimination

—i.e., disparate treatment on the basis of disability—the plaintiff must allege and prove that the defendant acted with discriminatory purpose. *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 49 (2d Cir.2002) ("*RECAP* ") (describing element of intentional discrimination in disparate treatment claim and who carries the burdens of persuasion and production); *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 425 (2d Cir.1995) ("Under the [disparate treatment] theory, a plaintiff can establish a prima facie case by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers ...." (quotation omitted)); *Jaramillo v. Prof'l Examination Serv., Inc.,* 544 F.Supp.2d 126, 130–31 (D.Conn.2008) (distinguishing ADA claims as requiring plaintiff to show defendant's animus was a "significant factor" in its action, from Section 504 claims requiring plaintiff to show defendant's animus was the "sole reason" for its action). Super, however, is not presenting a disparate treatment claim. Rather, she is charging that the defendants discriminated against her by failing to grant her a reasonable accommodation. *See RECAP,* 294 F.3d at 48–53 (distinguishing disparate treatment, disparate impact, and reasonable accommodation claims); *Taylor,* 267 F.R.D. at 50–51 (distinguishing intentional discrimination and reasonable accommodation claims).

The proper test for a reasonable accommodation claim under the ADA and Section 504 is whether Super was denied Section 8 rental assistance "by reason of [her] disability." *Henrietta D. v. Bloomberg,* 331 F.3d 261, 277 (2d Cir.2003) (quoting 42 U.S.C. § 12132).[8] In other words, Super must plead that she required an accommodation, and was ultimately denied housing benefits, "because of her disability"—that is, but for her mentally illness, she would not have needed to request an exception to the application of the defendants' Section 8 policies and her rental assistance would not have been terminated. *Id.* at 278. Framed this way, the onus of the reasonable accommodation analysis is not the defendants' purpose in terminating Super's rental subsidy, but whether Super was unable to comply with the defendants' neutral policy and was denied her Section 8 rental assistance because of her disability.

Super has pled enough facts to show that her mental disability contributed to her assault of Murphy. Paragraph 29 of the Complaint states that Murphy's behavior "exacerbated plaintiff's mental impairments and caused her great emotional upset," and that her subsequent actions for which she was arrested and prosecuted were "[i]n response to" that

psychological disturbance. At the motion to dismiss stage, that is enough to create a link between her purported disability and the denial of her rental subsidy, and to give rise to the inference that Super's Section 8 rental assistance was terminated by reason of her disability. Of course, Super will have the burden of proving at trial that she assaulted Murphy and subsequently lost her Section 8 benefits because of her disability, which may prove difficult. But, at this stage, when the court must take the allegations in the light most favorable to the plaintiff, Super's complaint is sufficient to withstand the defendants' motions to dismiss.

### 5. *Did the defendants have the requisite personal involvement?*

**\*11** Defendants Wilson–Coker and Nelson claim that they cannot be sued in this case because Super has failed to plead enough facts establishing that they were personally involved in and responsible for the termination of the plaintiff's Section 8 assistance. Their personal-involvement defense has two dimensions: Wilson–Coker and Nelson argue that they cannot be sued for an FHA violation because they were not individually responsible for the termination of Super's rental subsidy and, additionally, they cannot be held vicariously liable for alleged wrongs committed by their subordinates.

In her objection to Wilson–Coker's motion to dismiss, Super concedes that Wilson–Coker should not be a defendant in this case, albeit on a different ground: Wilson–Coker resigned from DSS in 2007, before the events of this case, and the current DSS Commissioner, Michael P. Starkowski, should be substituted for her. Because I ultimately grant Super's motion for leave to amend her complaint, I will substitute Starkowski for the purpose of this discussion.

The defendants make an allusion to section 1983 doctrine, although Super is not suing under section 1983, that in order for a public official to be liable under the FHA, ADA, and Section 504, he or she must have been personally involved in the commission of the tort such that the alleged harm is traceable to him or her. *E.g., Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). An official can be personally involved in a section 1983 case—and, presumably, an FHA, ADA, or Section 504 case—in several ways: by "directly participating in the infraction"; by "creat[ing] a policy or custom under which unconstitutional practices occurred, or allow[ing] such a policy or custom to continue"; or by being "grossly negligent in managing subordinates who caused the unlawful condition or event." *Id.* The defendants are also

correct in noting that there is no vicarious liability by which a supervisory official can be held legally responsible purely for having supervised a subordinate who violated the plaintiff's rights. *Meyer v. Holley,* 537 U.S. 280, 285–91, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003).

Even assuming this section 1983 law were relevant, none of it is helpful to the defendants. It is true that neither Starkowski nor Nelson made the final decision to terminate Super's Section 8 assistance. But that does not mean that they were either not responsible or could only be found responsible under a theory of vicarious liability. On the contrary, Super has alleged sufficient facts establishing that Starkowski and Nelson are liable for their maintenance of a policy to terminate rental subsidies automatically if a person is convicted of a felony, regardless whether the underlying act was caused by mental disability as Super alleges in this case. The accommodation that Super sought, and is still seeking as a matter of injunctive relief in this case, is an exception to that policy. As the parties responsible for maintaining the Section 8 programs for DSS and SHA, respectively, Starkowski and Nelson were likely responsible—or, at least, likely enough to support a plausible claim for relief—for the policy's continued validity and application. They, therefore, were personally involved within the meaning of the cases cited by the defendants.

### 6. *Is the DSS Commissioner shielded by sovereign immunity?*

 **\*12**  Finally, defendant Wilson–Coker, as Commissioner of DSS, charges that the Eleventh Amendment immunizes her from suit.[9] As in the previous section, I substitute Starkowski for Wilson–Coker because Super has conceded that Wilson–Coker is the wrong official to sue. Starkowski cannot claim sovereign immunity against Super's federal claims for injunctive relief alleged against her in her official capacity. *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). Starkowski, however, claims immunity against Super's causes of action for compensatory and punitive damages.

The Eleventh Amendment immunizes Starkowski from Super's FHA and ADA claims for monetary relief. There is no congressional abrogation of sovereign immunity in the FHA. *Sierotowicz v. N.Y. Div. of Hous. & Cmty. Renewal,* No. 04cv3886 (NGG), 2005 U.S. Dist. LEXIS 43028, at *5 (E.D.N.Y. June 14, 2005). As for the ADA, abrogation is likely limited to claims that the state discriminated

against a plaintiff "based on discriminatory animus or ill will towards the disabled," which Super is not alleging in this reasonable accommodation action. *See Garcia v. S. U.N.Y. Health Sciences Ctr. of Brooklyn,* 280 F.3d 98, 111 (2d Cir.2001). But Starkowski has no sovereign immunity with respect to Super's Section 504 claim. Section 504, which prohibits disability discrimination by "any program or activity receiving Federal financial assistance," 29 U.S.C. § 794(a), was passed pursuant to Congress's spending powers, U.S. Const. art. I, § 8, cl. 1, and included a provision abrogating states' sovereign immunity as a condition of receiving federal funding, 42 U.S.C. § 2000d–7(a)(1). *Garcia,* 280 F.3d at 113. Most circuits have held that a state's acceptance of federal funding implies its consent to waive its sovereign immunity from suits filed pursuant to Section 504. *See Stanley v. Litscher,* 213 F.3d 340, 344 (7th Cir.2000) (citing Fourth, Seventh, Ninth, and Eleventh Circuits as concluding that Section 504 "is enforceable in federal court against recipients of federal largesse," and noting that only the Eighth Circuit reached a different conclusion in a decision that was ultimately vacated on other grounds). In *Garcia,* the Second Circuit determined that New York had not made a knowing and intentional waiver of its sovereign immunity under Section 504 because the state, believing that its sovereign immunity was already abrogated by the nearly identical provisions of Title II of the ADA, could have been convinced that it had no sovereign immunity to waive with respect to the Rehabilitation Act. 280 F.3d at 114; *see also Mutts v. S. Conn. State Univ.,* No. 3:04cv1746 (MRK), 2006 WL 1806179, *3–*4 (D. Conn. June 28, 2006) (describing holding of Garcia and its subsequent application). But *Garcia* holds that if a court can conclude that a state knowingly and intentionally waived its sovereign immunity to Section 504 suits, such as by the state's continued acceptance of federal funds, then the state and its officials are not immune from Section 504 claims.

 **\*13**  At least two judges in the District of Connecticut have concluded that the state of Connecticut and its officials have waived their sovereign immunity to suits brought pursuant to Section 504 following *Garcia's* decision. *See Mutts,* 2006 WL 1806179, at *4 ("Therefore, if a state accepts federal funds under the Rehabilitation Act after *Garcia,* it necessarily follows from that decision that the state has knowingly waived its Eleventh Amendment sovereign immunity with respect to Section 504 claims that arose (as here) after the *Garcia* decision."); *Divergillio v. Peet,* No. 3:06cv2048 (AWT), 2009 WL 909428, *3 n. 1 (D.Conn. Mar. 31, 2009) (quoting *Mutts* with approval). I agree. As Judge Kravitz

explained, following *Garcia's* decision, Connecticut and its agencies were on notice that continuing to accept federal funds implies a knowing and intentional waiver of their sovereign immunity from Section 504 actions. *Mutts,* 2006 WL 1806179, at *4. *Garcia* clarified that Connecticut, like New York, still possessed its sovereign immunity for Section 504 claims, but the continued acceptance of federal funds would thereafter constitute a waiver of the state's immunity from suit. Thus, Super may sue DSS and its officials under Section 504 and attempt to obtain whatever relief—either injunctive or compensatory—the statute provides.

Starkowski also moves for the dismissal of the ADA and Section 504 claims against her in her individual capacity. From the face of the complaint, it is not clear whether Super is alleging this claim against the DSS Commissioner or any of the other individual defendants in their individual capacities. Those individual-capacity claims should be dismissed because the ADA and Section 504 do not permit suits against officials in their individual capacities. *Garcia,* 280 F.3d at 107. Starkowski also moves for dismissal of Super's negligence claim against him, found in Count Eight of the Complaint. That claim will be dismissed because Connecticut and its officials are immunized against state law claims absent a waiver, which the state has not made in this case. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 121, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Furthermore, Connecticut law protects Starkowski from the negligence claim against him in his individual capacity. Conn. Gen.Stat. § 4–165(a).

### 7. *Summary*

The defendants' motions to dismiss are, in principal, denied. Super has pled sufficient facts in her complaint to state a claim that she was denied an accommodation that was reasonable and necessary to enable her to use and enjoy the dwelling of her choice. Her request to continue receiving Section 8 benefits while she undergoes mental health treatment—i.e., her request for an exception to the defendants' neutral rule barring rental assistance to convicted felons or residents who have committed crimes on their property—is cognizable as an "accommodation" under the FHA, ADA, and Section 504. Next, Super has pled sufficient facts to demonstrate how the accommodation is necessary for her to obtain housing; she has also pled facts permitting the inference that her mental disability was the cause of her assault of Murphy and, as a result, she required an accommodation by reason of her disability. The plaintiff's complaint also states enough facts to demonstrate the defendants were personally involved in,

and not merely vicariously liable for, her purported denial of a reasonable accommodation. Finally, the defendants are not immune from suit under Section 504, although Starkowski, the appropriately identified DSS Commissioner, may not be sued for damages under the FHA or ADA. The DSS Commissioner also may not be sued in his individual capacity under the ADA or Section 504, or for common law negligence. Thus, Wilson–Coker's motion to dismiss is granted in part and denied in part, while the remaining motions to dismiss are denied in their entirety.

### B. *Super's motion for leave to amend her complaint and join additional parties*

*\*14* Super has filed a motion for leave to amend her complaint and join additional parties. Her amendments are intended to: (1) substitute one defendant (Starkowski for Wilson–Coker) and add four more defendants;[10] (2) add additional facts that the defendants claimed in their motions to dismiss were lacking; and (3) clarify which claims Super was asserting against each defendant and what relief she was seeking from them. Many of the new facts are helpful, but they are not necessary to overcome the defendants' motion to dismiss. Furthermore, the substitution and addition of new parties, as well as the clarification of claims against them, do not appear to raise any novel issues not already covered in the motions to dismiss. The only problem is the addition of DSS, as a state agency defendant, for injunctive relief sought under the FHA (Count Five) and ADA (Count Six). To obtain that injunctive relief, Super may only sue the responsible DSS officials in their official capacities and not the agency itself; DSS, as an arm of the state, would be protected by sovereign immunity. *Harris,* 572 F.3d at 72. DSS may also not be sued under common law negligence in Count Eight because it has not waived its immunity from suit.

Wilson–Coker objects to Super's motion. She raises the same arguments in opposition to amending the complaint as she did in her motion to dismiss; I reject those arguments for the reasons stated in my discussion of the defendants' motions to dismiss. Wilson–Coker also objects to Super's motion for leave to amend on the grounds that there is no "good cause," per Fed.R.Civ.P. 16(b)(4), to modify the scheduling order, which set September 19, 2009 as Super's deadline to add parties and amend the pleadings. There is sufficiently good cause to grant Super leave to amend her complaint. Super seeks to amend the pleadings in order to meet Wilson–Coker's previous demands for clarification in her motion to dismiss. Permitting the relatively minor changes Super

wishes to make, especially at this early juncture in the case, will not prejudice either party. *Cf. Huesser v. Hale,* No. 3:07cv1660 (CSH), 2009 U.S. Dist. LEXIS 105482 (D.Conn. Nov. 12, 2009) (denying motion for leave to amend pleadings as untimely and prejudicial when motion was filed five days before discovery deadline and sought to add 16 new claims to a complaint that had previously contained only ten). The plaintiff's motion is granted and Super may amend her complaint and join additional parties consistent with my rulings on the defendants' motions to dismiss.

## IV. Conclusion

For the reasons set forth above, defendant Wilson–Coker's motion to dismiss (doc. # 33) is GRANTED IN PART and DENIED IN PART. The remaining defendants' motions to dismiss (docs. # 43, # 47, & # 48) are DENIED. Super's motion for leave to amend her complaint and join additional parties (doc. # 73) is GRANTED. Any amendments to the complaint shall be consistent with the rulings in this decision.

**\*15** It is so ordered.

## All Citations

Not Reported in F.Supp.2d, 2010 WL 3926887, 42 NDLR P 24

## Footnotes

1   Defendant Patricia Wilson–Coker's motion is granted in limited part on sovereign immunity grounds, however.

2   Super's Section 8 payments covered her entire rent because she earned no monthly income. Although the complaint does not say it explicitly, any income she received was presumably limited to social security and other government benefits.

3   The exception to this is Wilson–Coker's motion, which includes arguments that this court lacks jurisdiction over Super's case because (1) Super did not properly serve process on Wilson–Coker, and (2) Super lacks standing to sue Wilson–Coker because Wilson–Coker was not personally involved in the events giving rise to the termination of Super's Section 8 assistance. With respect to the issue of service of process, Super concedes that Wilson–Coker is the wrong defendant to sue and moves to amend her complaint to substitute a new defendant for her. As discussed below, I grant Super's motion to amend her complaint, so the improper service of process argument is moot. Next, the claim that the DSS Commissioner was not adequately involved is better understood as a challenge that Super fails to state a claim for relief than a challenge Super's standing and thus to the court's subject matter jurisdiction. I take up this ground for dismissing the complaint below. Unlike the other defendants, Wilson–Coker also argues that she is protected by sovereign immunity. I take up that defense below, as well.

4   The relevant statutory language is as follows: Under the FHA, it is unlawful to discriminate "against any person in the terms, conditions, privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap," and "discrimination includes ... a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."42 U.S.C. § 3604(f)(2) & (f)(3)(B). I assume that Section 8 administrators are covered by the FHA because the defendants have not challenged the FHA's application to them and courts have generally interpreted the FHA to cover parties who are not strictly property owners or landlords. *See Taylor,* 267 F.R.D. at 48–49 (assuming that FHA is applicable to plaintiffs' claims against Section 8 administrator).

   Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."42 U.S.C. § 12132. Regulations promulgated pursuant to the Act hold that "a public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity,"28 C.F.R. § 35.130(b)(7).

   Section 504 is similarly worded. The statute states: "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."29 U.S.C. § 794(a). Housing regulations define a "qualified individual" under Section 504 as "an individual with handicaps who meets the essential eligibility requirements and who can achieve the purpose of the program or activity without modifications in the program or activity that the recipient can demonstrate would result in a fundamental alteration in its nature."24 C.F.R. § 8.3.

5   There is no claim from the defendants that Super is not disabled within the meaning of the FHA, ADA, or Section 504.

6    The complaint does not say this outright. But this is how one can most favorably read paragraph 40 of that document, in which Super describes the evidence she put forward at her November 17, 2008 hearing. The statements of her social workers and other therapists suggest that she was receiving treatment following her assault of Murphy that she did not have access to beforehand.

7    The defendants are challenging only the necessity, and not the "reasonableness," of Super's requested accommodation. *See* Wilson–Coker Mem. of Law 36 n. 25.

8    In their briefs, the defendants cite *Jaramillo,* where the district court applied the "sole reason" test to the plaintiff's Section 504 reasonable accommodation claim. But that discussion in *Jaramillo* was arguably dicta: the district court granted summary judgment to the defendants because no reasonable jury could find that the accommodation offered to the plaintiff was unreasonable. 544 F.Supp.2d at 131. Furthermore, the district court's application of the "sole reason" test appears to have been based on an over-reading of *RECAP,* the only case that the *Jaramillo* Court cited for its analysis. *See id.* The *RECAP* decision discussed the "sole reason" test only in the context of ADA disparate treatment claims. So, too, did the decisions supporting *RECAP* concern disparate treatment, and not reasonable accommodation, claims. *E.g., LeBlanc–Sternberg,* 67 F.3d at 425. *Jaramillo* is neither persuasive nor binding here; rather, the better authority is *Henrietta D.,* which postdates *RECAP* and concerns a reasonable accommodation cause of action.

9    The other defendants are not state officials and have not claimed that they are entitled to sovereign immunity.

10   The new defendants, other than Starkowski, are Mary Cattanach of DSS, Maritza Javier of SHA, and the DSS and SHA agencies.